# THE MINERS' DITCH COMPANY *v.* MARKS ZELLERBACH, AND GEORGE C. POWERS

Dealing with a Corporation.—The rights of strangers dealing with a corporation may vary according as they are considered with reference to the corporation itself, its creditors, or the stockholders of the corporation.

Different Kinds of Corporations.—There are three classes of corporations, to wit : public municipal corporations, the object of which is to promote the public interest ; corporations technically private, but of a *quasi* public character, having in view some public enterprise in which the public interests are involved, such as railroad, turnpike, and canal companies ; and corporations strictly private.

When Acts of Corporation are *ultra vires*.—The term *ultra vires*, when used in reference to corporations, is employed in different senses. An act is said to be *ultra vires* when it is not in the power of the corporation to perform it under any circumstances; and an act is also said to be *ultra vires* with reference to the rights of certain parties, when the corporation cannot perform it without their consent ; and it may also be *ultra vires* with reference to some specific purpose, when the corporation cannot perform it for that purpose.

Idem.—When the act of the corporation is *ultra vires* in the first sense mentioned, it is void *in toto*, and the corporation may avail itself of the plea; but when it is *ultra vires* in the second and third senses, the right of the corporation to avail itself of the plea will depend upon the circumstances of the case.

When Corporation may Repudiate its Contract.—In a contract between a corporation and strangers dealing with it, when the act in question is one which the corporation has no power to perform under any circumstances, the corporation may avail itself of the defense of *ultra vires* ; but when the act may be performed by the corporation for some purposes but not for others, the defense of *ultra vires* may or may not be available. If the stranger dealing with the corporation knew of its intention to perform the act for an unauthorized purpose, the defense is available, otherwise not.

Corporation may Sell its Property.—A corporation organized for the purpose of owning ditches for the conveyance and sale of water, possesses the power of selling and conveying all its corporate property, provided the sale is made for corporate or lawful purposes, and strangers taking a conveyance have a right to assume, as against the corporation, that the sale was for a lawful purpose.

Idem.—If the corporation contests the validity of such sale on the ground that it was made for an unlawful purpose, it devolves upon it to show that the party making the purchase knew of such unlawful purpose.

Idem.—Such sale may be made to any person, natural or artificial, capable of taking, and the stockholders of one or more corporations may form themselves into a new corporation, and the property of one or both of the old corporations may be conveyed to the new corporation.

Deed of Corporation.—Where a deed purporting to be the deed of a corporation is signed by its trustees as trustees, and has the corporate seal affixed, it is admissible in evidence as a deed of the corporation, and is itself *prima facie* evidence of the regular and duly authorized execution of the same.

Idem.—It devolves upon the party contesting the validity of such deed to overthrow the presumption that it was regularly and duly executed.

Right of Corporation to Contest its own Sale.—Where a corporation sells and conveys all its property for an illegal purpose, the contract being fully executed on both sides, and the property is afterwards purchased by a stranger with knowledge of that fact, in an action against such stranger to recover the property the corporation cannot avail itself of the invalidity of the transaction to defeat the conveyance.

Illegal Sale of Corporation Property.—Conceding it to be unlawful for a corporation to make a sale of all its property to another corporation, and receive in payment therefor the stock of the grantee to be distributed among its own stockholders, yet, if such sale is made, and the contract fully executed, the corporation itself cannot recover back the property sold, or set aside the contract on account of its illegality.

Appeal from the District Court, Fourteenth Judicial District, Nevada County.

This was an action to recover possession of the Miners' Ditch, the Poorman's Ditch, the extension of the Poorman's Ditch, the Grizzly Ditch and its branches, the undivided two fifths of the Eureka Lake Water Company's Ditch, the undivided two fifths of the Gray Diggings Mining Claims, the undivided two fifths of the Lewis Mining Claims, the undivided two fifths of the Isembeck & Co.'s Mining Claims, the undivided two fifths of the Eureka Lake Water Company's saw mill, and the land whereon the same stands, together with all and singular the appurtenances to the above named and specified property belonging.

The complaint was in the usual form, alleging ownership of and possession of the property by the plaintiff on the 3d day of January, 1863, and its ouster by the defendants on

the same day. The defendants, in the tenth subdivision of their answer, set up the following as an equitable defense:

"And for a tenth further and separate answer to the said several causes of action in the said amended complaint mentioned, and as a ground for the equitable interposition of the Court, this defendant avers and shows as follows:

"That on the 14th day of May, 1859, the plaintiff, the Miners' Ditch Company, was, and for some time prior thereto had been, a corporation duly organized and existing under the laws of this State, and the owner and possessed of the several ditches and parcels of property mentioned and described in the first, second, third, and fourth counts of plaintiff's amended complaint.

"That at the same time another corporation, duly organized and existing under the laws of this State, and styled the Eureka Lake Company, owned and possessed certain other ditch property in said County of Nevada, which said ditches were constructed and used for the purpose of conveying and selling water for mining and other purposes, in said County of Nevada and its vicinity.

"That the said Miners' Ditch Company and the said Eureka Lake Company were rival companies, selling water in the same market.

"That a large portion of the stock in each of said corporations was held and owned by persons who were stockholders in both of said corporations.

"That at some time in the month of May, 1859, and prior to the 14th day of said month, at a meeting of the Board of Trustees of the Eureka Lake Company, regularly called and held for the purpose, it was unanimously resolved and determined, by a vote of the said Board of Trustees, that the President of said corporation, on its behalf, be and he thereby was authorized and directed to propose to the Miners' Ditch Company that the several properties of and belonging to the said several corporations be consolidated, and the

said corporations united in one, upon certain specified terms.

"That afterwards, on the 14th day of May, 1859, a meeting of the stockholders of the said Miners' Ditch Company, called for the purpose of receiving and considering the proposition of the Eureka Lake Company to consolidate and unite the several properties and companies, as hereinbefore set forth, was held at its usual place of business, at which meeting the President of the Eureka Lake Company, in pursuance of the authority so given to him as aforesaid, did attend, and, on behalf of the said Eureka Lake Company, proposed to said Miners' Ditch Company to unite and consolidate the several companies and properties as aforesaid. That, thereupon, the said proposition was accepted, and the stockholders of the said Miners' Ditch Company, by a resolution duly passed, authorized and empowered the Directors of said company to make the necessary arrangements for and to perfect the union and consolidation of the said companies as aforesaid.

"That at said several meetings of the stockholders and Board of Trustees of the Eureka Lake Company, and of the stockholders of the Miners' Ditch Company, it was agreed and determined by vote, for the purpose of carrying into effect the agreement between said corporations for the union and consolidation thereof, and until the final consolidation and union thereof could be perfected, the Directors of said several corporations should, as a joint Board, temporarily receive and have and hold possession and control of the entire property of said corporations, and jointly conduct the business thereof for and on behalf of such consolidated companies, and until the said consolidated company could be formed, and that such consolidated companies should share the profits and losses of such consolidated properties.

"That soon after the said last named date, viz: on or about the 29th of June, 1859, the said joint Board of Directors so formed as aforesaid, and pursuant to said agreement, received from said several corporations the possession of all of said

property, and took and entered into possession of the same, for and on behalf of said consolidated company, and conducted and managed the same according to the terms of said agreements, on behalf of said consolidated company, and under the name and style of the Eureka Lake and Miners' Ditch Company, until the formation of the company styled the Eureka Lake Water Company, as hereinafter set forth.

"That during the time the said joint properties were in possession of and under the control of the said joint Board, divers large sums of money, arising from the receipts of the said joint properties, were expended in the repairs and improvements of the properties formerly belonging to the said Miners' Ditch Company, and described in the first, second, third, and fourth counts of said amended complaint.

"That afterwards, and on or about the month of September, 1860, a meeting of the stockholders of the said Miners' Ditch Company was held at the usual place of business of said company, at which meeting the union and consolidation of said corporations was ratified and confirmed, and by a resolution duly passed it was agreed and determined that, for the purpose of more fully carrying into effect the said union and consolidation, the Directors of said Miners' Ditch Company were authorized, empowered, and directed to unite with the Directors of the Eureka Lake Company, in the organization of a corporation to be called and styled the Eureka Lake Water Company, and which corporation, when organized, should be the successor in interest of the said Miners' Ditch Company, the said Eureka Lake Company, and the joint company—the Eureka Lake and Miners' Ditch Company; and the said Directors of said Miners' Ditch Company were further authorized and empowered to convey to the said Eureka Lake Water Company, when formed, the entire property then lately owned by the said Miners' Ditch Company, upon the consideration that the said Eureka Lake Company should, in like manner, convey to said Eureka Lake Water Company the property then formerly owned by it; and it was then and there further agreed that the stock

of such new corporation, the Eureka Lake Water Company, should be issued to the stockholders of said Eureka Lake Company and the Miners' Ditch Company, in the proportions agreed upon.'

"That at or about the same time as last aforesaid, at a meeting of the stockholders of the Eureka Lake Company, similar resolutions to those so passed at the meeting of the stockholders 'of the Miners' Ditch Company were passed, and the Directors fully authorized to make the necessary conveyances and documents, and to enter into the necessary arrangements for carrying into effect the objects of such resolutions.

"That afterwards, and on or about the 17th day of October, 1860, the Directors of the said several corporations, as such joint Board as aforesaid, duly organized a corporation in the said County of Nevada, under the general laws of this State, and under the name and style of the Eureka Lake Water Company.

"That afterwards, and on or about the 25th day of October, 1860, the Eureka Lake Company, by its Directors thereto duly authorized, conveyed, transferred, and delivered to the said Eureka Lake Water Company full and complete possession of all the property theretofore owned by it; and on or about the 29th day of October, 1860, the said Miners' Ditch Company, by its Directors thereto authorized, in like manner conveyed by deed executed under the corporate seal of said company, and duly transferred and delivered to the said Eureka Lake Water Company, full and complete possession of all of the property formerly owned by it, including the property described in the first, second, third, and fourth counts of said amended complaint.

"That immediately thereupon the said joint Board, so holding possession as aforesaid under the name of the Eureka Lake and Miners' Ditch Company, under the agreements aforesaid, for the benefit of the consolidated company, so to be formed under such agreements as aforesaid, gave up and delivered to the said Eureka Lake Water Company, the cor-

poration so formed under the various agreements aforesaid, full and complete possession of all the joint properties so held by them as aforesaid.

"That thereupon the said Eureka Lake Water Company entered into possession of all of said joint properties, including all of the ditches, mining claims, and premises described in the said amended complaint, as the successor in interest of the said Eureka Lake Company, the Miners' Ditch Company, and of the said joint Board of Eureka Lake and Miners' Ditch Company, and from thence hitherto until the time hereinafter set forth continued to hold the possession of the same, and to use and enjoy the same as such successor in interest.

"That upon such organization of the Eureka Lake Water Company, and such transfers as aforesaid, stock of said company was duly issued to the various stockholders of the Miners' Ditch Company and the Eureka Lake Company in the proportions theretofore agreed upon.

"That after the Eureka Lake Water Company received possession of the various properties as hereinbefore set forth, and previous to the 3d day of January, 1863, it expended large sums of money in purchase of ditches and water rights, and the construction of flumes, ditches, and reservoirs, and other valuable and permanent improvements upon the same, amounting in all to between four hundred thousand dollars, and five hundred thousand dollars, which improvements greatly enhanced the value of such properties.

"That it so expended in improvements upon the property described in the first, second, third, and fourth counts of said amended complaint, at least forty thousand dollars. That it constructed and completed the ditch described in the fifth count of said complaint at a cost of over thirty thousand dollars, and purchased the mining claims and property described in the sixth, seventh, eighth, and ninth counts thereof.

"That at the time of the transfer of possession as aforesaid, and of the conveyance aforesaid, the said Miners' Ditch

Company was indebted in large sums of money to various parties, a portion of which indebtedness was secured by mortgages upon said property formerly belonging to said company.

"That in the year 1862 said mortgages were foreclosed, and the mortgaged property ordered to be sold for the satisfaction thereof, and that said property was advertised for sale pursuant to said order.

"That the said Eureka Lake Water Company was then largely in debt, and had no means wherewith to satisfy said mortgages and prevent the sale of said property, and borrowed of this defendant and of the defendant Powers (then partners in business under the firm name of Marks & Co.) the sum of about ninety thousand dollars, which was applied in payment and satisfaction of a portion of said mortgages, and the accrued interest and costs. That prior to the date of this loan the said Eureka Lake Water Company were indebted to this defendant and said defendant Powers in other large sums of money, which were borrowed of them and used for the benefit of the entire property, including the property formerly owned by the Miners' Ditch Company, with the full knowledge and assent of the Miners' Ditch Company, and its stockholders and members.

"That on the 7th day of April, 1862, and prior to the foreclosure of the said mortgages of the Miners' Ditch Company, the said Eureka Lake Water Company was indebted to this defendant and defendant Powers in the sum of one hundred thousand dollars, for moneys before that time loaned to the Eureka Lake Water Company, and then remaining unpaid; and on said last mentioned day applied to said defendants for the further loan of one hundred thousand dollars, to be used for the purpose of paying off the mortgages upon the property formerly owned by the said Miners' Ditch Company, then in process of foreclosure as aforesaid, and for the further purpose of paying off certain other liens and incumbrances existing against the entire property of said Eureka Lake Water Company.

"That at the date last aforesaid the said Eureka Lake Water Company executed and delivered to this defendant, and his then partner, the defendant Powers, a mortgage upon the entire property of said company, including the property described in the amended complaint, to secure payment of the sum of one hundred thousand dollars, theretofore advanced and loaned as aforesaid, and also to secure payment of such other and further sums, not to exceed in the aggregate the further sum of one hundred thousand dollars, as the said defendant and Powers should thereafter, at the request of said company, advance and loan to it; and at the same time, and in said mortgage, covenanted with this defendant and Powers that they should have and receive the net proceeds of all of said property, to be applied in payment of said mortgage debt until the same should be fully paid.

"That thereafter, and prior to the 3d day of January, 1863, this defendant and Powers, at the request of said Eureka Lake Water Company, advanced and loaned to it the additional sum of one hundred thousand dollars, as provided for in said mortgage.

"That at the date last aforesaid, the said Eureka Lake Water Company, having failed to make any payments whatever on account of said mortgage debt, by an instrument in writing, under the seal of said corporation, transferred to this defendant and defendant Powers all of said mortgaged property, and delivered to them the possession thereof, and authorized them to keep, manage, and control the same, and apply the net proceeds thereof in payment of said mortgage debt, until the same, and the interest accruing thereon, should be fully paid.

"That immediately thereupon this defendant and defendant Powers took and entered into the possession of all of said property, and retained possession thereof under said agreement, and kept an accurate account of the proceeds thereof, until the 5th day of February, 1865, at which last

mentioned date they, the said defendants, became the owners by purchase of all said property.

"That this defendant and defendant Powers so entered into possession of said property as aforesaid, as the successors in interest of the said Eureka Lake Water Company, the Eureka Lake Company, the Miners' Ditch Company, and the said joint Board, or Eureka Lake and Miners' Ditch Company, and held and possessed the same, as such successors in interest, until the time next hereinafter mentioned.

"That on the 1st day of September, 1865, this defendant purchased of the defendant Geo. C. Powers all interest (being the undivided one half) which he held and owned in said property, so acquired as aforesaid, and all his right, title, and interest, possession, claim, and demand therein.

"That ever since the time last aforesaid this defendant has been in possession of all of said property, claiming title thereto as the successor in interest of the said defendant Powers, and of the Eureka Lake Water Company, the Eureka Lake Company, the Miners' Ditch Company, and the said joint Board or Eureka Lake and Miners' Ditch Company, and at the time of the commencement of this suit was so in possession as such successor.

"That during all the time said property has been held and possessed by this defendant, either alone or in copartnership with said defendant Powers, the net proceeds thereof have amounted to but little more than the interest accruing upon the principal of said mortgage debt.

"That the property and lands upon which the said several ditches, in said complaint described, are constructed and built, and also upon which the mining claims and mill site, in said complaint set forth, are situated, are the public lands of the United States of America, the fee in the same never having been granted to any one, or passed out of the said United States.

"That the said ditches, mining claims, mill site, and property, in said complaint mentioned and described, being held by possessory title, the same passes by delivery of posses-

sion, and this defendant is in possession of all of said ditches, mining claims, and property by successive delivery of possession from the said Miners' Ditch Company.

"That during the entire period of the transactions above set forth, from the date of the several meetings of the Miners' Ditch Company and of the Eureka Lake Company, in May, 1859, until the commencement of this action, the Miners' Ditch Company, and all and every one of the Directors, members, and stockholders have had actual knowledge and notice of all, each, and every one of the transactions hereinbefore set forth; that said Directors, members, and stockholders received the stock of the said Eureka Lake Water Company, and have acted as stockholders of such last named company at stockholders' meetings, and as such stockholders have had the benefit of the large sums of money advanced and loaned by this defendant and defendant Powers, as aforesaid, and of the improvements and additions to the property as aforesaid; and during all that time neither the said Miners' Ditch Company, nor its Directors, members, or stockholders, or any or either of them, or any one of them, have ever objected to or made any question of the validity of any one of the transactions aforesaid; but, on the contrary, have always during all that time assented to and recognized the same and acquiesced therein, and during all of said time, as aforesaid, they have each and every one of them, well knowing that said Eureka Lake Water Company and its successors held and possessed said property, claiming title thereto, have recognized such title, and acquiesced in the ownership and possession thereof.

"That the said Eureka Lake Water Company, and its successors, and those from and under whom they claim, have, ever since the month of May, 1859, been in possession of the ditches, mining claims, and premises in said amended complaint mentioned and described, and of every part and parcel thereof, claiming title thereto, and have had the peaceable, quiet, and undisturbed possession thereof, free and

Cal. Reps. XXXVII—70

clear from any claim, right, or title by the said Miners' Ditch Company, or any of its Directors, members, or stockholders, or of any person or persons whatever.

"And the defendant says that the said plaintiff, although now enjoying the full benefit of all the transactions aforesaid, and claiming the right to enjoy said benefit, now pretends and claims that all of said transactions, as hereinbefore set forth, are and were illegal and void, and passed no title, or any right of possession of, in, or to the property formerly belonging to said Miners' Ditch Company, either to said joint Board or Eureka Lake and Miners' Ditch Company, or to the Eureka Lake Water Company, and seeks by this action to set aside the same, and to deprive this defendant, who has acted in good faith all throughout said transactions, of his just, legal, and equitable rights in the premises, and to oust him from the possession of all of said property; all of which said pretences and claims, this defendant charges, are in bad faith, and against the solemn acts of the said plaintiff, long acquiesced in, and are contrary to equity and good conscience.

"Wherefore, this defendant prays that upon the full hearing of this cause, and upon a full consideration of the facts and premises, this Honorable Court will, by its order and decree, declare the various transactions hereinbefore in the tenth separate defense of this defendant set forth, valid, and legal, and binding upon the said Miners's Ditch Company, and each and every one of its Directors, members, and stockholders. That by said order and decree the title of this defendant to all and every the said ditches, mining claims, and premises in said amended complaint described, may be declared to be a good and valid title in law and equity, as against the said Miners' Ditch Company, and each and every one of its stockholders and members, and any person or persons claiming by, through, or under it. That by said order and decree it may be declared that the plaintiff has not any right, title, interest, or estate whatever in or to the said ditches, mining claims, and premises aforesaid, or any part

thereof, and that all claims or pretenses of said plaintiff to the same, or to any part thereof, is wholly unjust, invalid, and unfounded, either in law or equity; and that the plaintiff may be adjudged to be forever barred of and from all right, title, interest, claim, or estate in said premises, and every part thereof. That by said order and decree the said plaintiff may be ordered and adjudged to make, execute, and deliver to this defendant such deed or deeds of conveyance, or other instruments which shall to this Court, on a full investigation and consideration of the case, appear necessary to perfect and quiet the said defendant's title to said ditches, mining claims, and premises, as against said plaintiff, and all persons claiming by, through, or under it.

"And this defendant prays for such other and further relief, decree or decrees, as to this Honorable Court shall seem meet and right in the premises, and as equity and good conscience shall require."

The issues raised by this equitable defense were first tried, and the Court found the following facts:

"First—Plaintiff, the Miners' Ditch Company, is, and since a time prior to the year A. D. 1859 has been, a corporation duly organized and existing under the general incorporation laws of this State, its object being the building and maintaining water ditches and the sale of water in said Nevada County.

"Second—In May, 1859, the plaintiff owned and was in possession of all that portion of the premises mentioned in the complaint, and described therein as the 'Miners' Ditch,' the 'Poorman's Ditch,' and the 'Grizzly Ditches.'

"Third—At the same time, viz: May, 1859, there was another corporation duly organized and existing, called the 'Eureka Lake Company,' which owned ditches and water rights in said county, and in the immediate vicinity of those of plaintiff, both companies supplying the same markets.

"Fourth—The property and business of these two com-

panies being similar, and a number of persons being members and stockholders in both, in the Spring of 1859 the incorporators began to talk about a union of the property and business of the two companies; and after considerable discussion it was finally agreed in the month of May, 1859, by both corporations, viz: the plaintiff and the Eureka Lake Company, that the property of the two corporations should be thrown together and managed in common, and should be owned in the proportion of two shares to the Miners' Ditch Company and three shares to the Eureka Lake Company. Certain improvements were to be made by each corporation on its own original property, and each was to pay its own debts then existing.

"Fifth—Under this agreement the two companies commenced acting together on the 29th of June, 1859. At that time all the property of both corporations was put into the possession of common agents of both, who had full control and management of the property and business down to the Fall of 1860. Business was done in the name of the Eureka Lake *and* Miners' Ditch Companies. During this time large amounts of money were expended in improving the common property, and the premises described in the complaint as the 'Extension of Poorman's Ditch,' 'Extension of Grizzly Ditch,' 'Gray Diggings,' and 'Lewis' Ground,' were acquired.

"Sixth—This plan of conducting the business of the two companies, under the joint name of both, was only intended to be temporary; and during the year 1860 the members of the two corporations began to discuss the project of organizing a new corporation, to which the property of the old ones should be conveyed. To perfect this arrangement there was a meeting of the stockholders of the Eureka Lake Company, held in pursuance of a notice duly published in a public newspaper of said county, on the 3d day of September, 1860, at which it was resolved that a new corporation, to be called the Eureka Lake *Water* Company, should be formed, and that the Eureka Lake Company would convey to it all its property, upon conditions that the Miners' Ditch

Company would do the same, and that stock of the new cor-
poration would be credited to the stockholders of the two
old companies in the proportions agreed upon.  The Trustees
were authorized to make the conveyance.  The new corpora-
tion was to be organized by the stockholders of the two old
ones.

"Seventh—There was also a regular annual meeting of
the stockholders of the Miners' Ditch Company, on the
second Saturday of September, 1860, that being the time
prescribed by the by-laws of the company for the regular
meeting of the stockholders.  The meeting adjourned for
two weeks.  At or about the time to which this meeting had
adjourned, there was a meeting of either the stockholders or
the Trustees, or both.  The testimony does not show clearly
the exact character of this meeting—that is, whether it was
of the stockholders or Trustees; but it is clear that there
was a meeting of either one or the other, or both.  At this
meeting a resolution was passed authorizing the Trustees to
convey the property of the Miners' Ditch Company to the
new corporation to be formed, viz: the Eureka Lake *Water*
Company.

"Eighth—On or about the 29th of October, 1860, a deed
bearing that date was executed by the Trustees of the Miners'
Ditch Company to the Eureka Lake Water Company, con-
veying all the property of the former to the latter, including
the property described in the complaint, except the Malakoff
Ravine and the Eureka Lake sawmill, which were acquired
afterwards by the Eureka Lake Water Company.  This deed
purports upon its face to be the deed of the Miners' Ditch
Company, *as a corporation*, has the corporate seal annexed,
and is signed, *as Trustees*, and duly acknowledged by James
B. Henry, Geo. C. Powers, James Cregan, Geo. Fellows, and
Robert McKerrow, who were at the time the Trustees of the
corporation.  The deed was duly recorded in the Recorder's
office of said county (Book Nine, p. 189,) on the 11th day of
November, 1861, and is hereby made part of these findings.

"Ninth—About this time the members of the Eureka

Lake Company were advised by counsel that its incorporation had never been legally perfected, and that a valid deed could be made only by the members in their individual capacity; and such a deed was made on the 25th of October, 1860, by the stockholders of the Eureka Lake Company to the Eureka Lake Water Company, which purported to convey all the property of the former to the latter. This deed was recorded November 11th, 1861, in Book Nine of Deeds, page one hundred and ninety-one, records of Nevada County.

"Tenth—On the 14th of November, 1860, the Eureka Lake Water Company, having been duly organized as a corporation under the general laws of this State, took possession of all the property of the Miners' Ditch Company and the Eureka Lake Company, conveyed or attempted to be conveyed by said two deeds, and from that time to January, 1863, had full possession and control of the same, claiming it as its own under said deeds, and no one interfering with or disputing its title or possession.

"Eleventh—Immediately after the organization of the Eureka Lake Water Company, stock books were opened and stock was issued to the members of the two old companies in the proportions agreed.

"Twelfth—After the Eureka Lake Water Company took possession it expended large sums of money in improving the property and paying off liens thereon.

"Thirteenth—The Eureka Lake Water Company, in 1862, executed to the defendants, Zellerbach and Powers, a mortgage on all its property, including that described in the complaint, to secure the payment of the sum of two hundred thousand dollars. This was for money advanced and to be advanced; and the whole sum of two hundred thousand dollars was advanced before January, 1863. The mortgage provides that the defendants might receive and apply the profits and income of the property to the satisfaction of the mortgage debt; and on the 3d of January, 1863, the Eureka Lake Water Company gave full possession and control of all the property to Zellerbach and Powers for that purpose.

Zellerbach and Powers held full and uninterrupted possession under the arrangement until the 5th day of February, 1865, at which time they acquired all the right and title of the Eureka Lake Water Company to the property, by virtue of a Sheriff's deed made on an execution sale under a judgment recovered against said company by one —— Martin. On the 5th of September, 1865, the defendant Powers by deed conveyed to defendant Zellerbach all his interest (being one half) in the premises. Down to September 5th, 1865, Zellerbach and Powers, and from that time to the present Zellerbach alone, have been in continuous possession of all the premises, holding under and as successors to the Eureka Lake Water Company; and that said mortgage has not been paid, nor have the rents and profits of the property been sufficient to satisfy the same.

"Fourteenth—The Eureka Lake Water Company made large improvements on the property formerly held by the Miners' Ditch Company, and described in the complaint, amounting in value to at least fifty thousand dollars.

"Fifteenth—It also paid mortgages on said property, which had been created by the Miners' Ditch Company, amounting to at least ninety thousand dollars.

"Sixteenth—It also expended other large sums of money in general improvements of and additions to the whole property acquired from the two old corporations, and paid off large liens and mortgages which had been created by the Eureka Lake Company on the property formerly owned by that corporation.

"Seventeenth—It does not appear affirmatively that the Trustees of the Miners' Ditch Company, in corporate body assembled, formally authorized the execution of the deed to the Eureka Lake Water Company, or that it was executed at a formal meeting of the Board of Trustees. It was executed, however, by the three Trustees, Henry, Powers, and Oregan, at one and the same time, and while they were together and in the presence of each other. The other two

Trustees, Geo. Fellows and Robert McKerrow, signed it separately and at another time.

"Eighteenth—The by-laws of the corporation (the Miners' Ditch Company) do not contain any provisions about the meetings of the Trustees; and it does not appear how they were called or held, or in what manner they usually transacted their business.

"Nineteenth—The certificate of incorporation of the Miners' Ditch Company contains the following statement of the objects and purposes of the company:

"'The object for which the said company is formed is to direct the waters running in the bed of the Middle Yuba, at or near a point one thousand six hundred yards above the Forks, and by means of a canal or canals, to be constructed by said company, to carry said water along the ridge on the south side of said Middle Yuba, and supply the miners of Snow Point, Orleans, Moore's and Woolsey's Flats, and other places along said ridge, with water, and employ said water for mining, manufacturing, and mechanical purposes.'

"Twentieth—From the date of the deed in October, 1860, the Trustees of the Miners' Ditch Company did not meet again as a Board until October, 1865, and during that time did not pretend to do any business, or to set up any claim to or control of the property described in the complaint; and it had knowledge that the Eureka Lake Water Company, and afterwards Zellerbach and Powers, had possession of the property, and claimed ownership of the same under the said deed from the Miners' Ditch Company.

"Twenty-first—All the premises described in the complaint, as well as the other property claimed by defendant, and also various other ditches owned by other companies, are situated on the ridge which divides the waters of the Middle and South Forks of the Yuba River; nearly all the stockholders of the Miners' Ditch Company lived on said ridge at the time of the transfer of the property to the Eureka Lake Water Company; the sale and transfer were public and notorious events; and I find that a majority of

the stockholders had actual notice of the transaction, and that all are chargeable with such notice. No objection was made to the asserted title of the Eureka Lake Water Company, or its possession, by the Miners' Ditch Company or by any one of its Trustees or agents, until the Fall of 1865—a short time before this suit was commenced.

"Twenty-second—All the property described in the complaint is situated on the public domain of the United States, and is held by possessory title alone.

"Twenty-third—Counsel for plaintiff insists that I shall find categorically, as a fact, whether or not the property described in the deed of October, 1860, was essential to the business and existence of the Miners' Ditch Company. Complying with this request, I find that it was *not*. I look upon this question, however, as scarcely one of pure fact, and I prefer finding the real facts upon the point. They are these: After the company had sold all its property, of course it could not have done any more business in the matter of mining or selling water without acquiring another water right and ditch, by purchase or by location and construction. It might have purchased other ditches and water rights in the same vicinity; it might, also, have located another water right in the same stream to which its original ditch was constructed, and might have built a new ditch. It could have thus obtained a supply of water in the wet season, but not in the dry season; and the project of building a new ditch would probably not have been profitable.

"[Quite a number of objections to the introduction of testimony were made during the progress of the trial, which, by consent, were taken under advisement, to be decided at the final determination of the case. The objections of plaintiff to the evidence offered to show that the union of the business of the two corporations was advantageous, are sustained. The other objections are overruled. I cannot at present remember each of them, but they all refer to mere preliminary matters; that is, to the so called consolidation

of 1859, and to other matters occurring before the deed of October, 1860; whereas the real rights of the parties, as is stated in the 'opinion' hereto annexed, depend upon the said deed and the *subsequent* conduct of the parties.]

"From the foregoing facts I find, as a conclusion of law, that the Miners' Ditch Company has ratified, adopted, and made its own the deed of October 29th, 1860, above referred to, purporting to convey its said property to the Eureka Lake Water Company, and cannot be heard to dispute it; and that defendent Zellerbach is entitled to the affirmative relief prayed for in his answer. Let judgment be rendered in accordance with his said prayer."

The following judgment was rendered:

"This cause came on regularly for trial, the parties hereto appearing by their respective counsel. A trial by jury having been expressly waived, the cause was tried before the Court sitting without a jury. Whereupon witnesses on the part of plaintiff and defendant were duly sworn and examined; and the evidence being closed, the cause was submitted to the Court for consideration and decision; and after due deliberation thereon the Court delivers its findings and decision in writing, which is filed, and orders that judgment be entered in accordance therewith.

"Wherefore, by reason of the law and findings aforesaid, it is adjudged and decreed that the title of the defendant, Marks Zellerbach, to all and every the ditches, mining claims, and premises in the amended complaint in this action described, is a good and valid title in law and equity as against the plaintiff, the Miners' Ditch Company, and all and every one of its stockholders and members, and any person or persons claiming by, through, or under it.

"And it is further adjudged and decreed that the plaintiff, the Miners' Ditch Company, has not any right, title, interest, or estate whatever in or to the said ditches, mining claims, or premises, or any part thereof, and that all claims or pre-

tenses of said plaintiff to the same are wholly unjust, invalid, and unfounded, either in law or equity.

"It is further ordered, adjudged, and ·decreed that the plaintiff, and all persons claiming under it, be forever barred of and from all right, title, and interest, claim, and estate in said premises, and every part thereof.

"And it is further ordered that said defendant, Marks Zellerbach, have and recover of and from said plaintiff his costs in this behalf expended, amounting to the sum of ——."

The plaintiff appealed.

The other facts are stated in the opinion of the Court.

*J. B. Harmon*, for Appellant.

The consolidation of the Miners' Ditch Company and Eureka Lake Company, by a mutual transfer and sale of their respective ditches and water rights to the Eureka Lake Water Company, in consideration of shares therein issued to the stockholders of the two former companies, in the proportion of two fifths to three fifths, was *ultra vires*, and therefore void.

To determine whether the Miners' Ditch Company had the power to sell all its property, we must resort to the statute, and not to the common law. The latter is neither the source nor measure of the powers of the corporation. To say that by the common law a corporation has the power to sell its property, that it may exist without property, that the only restriction on the power to sell is that it cannot touch the franchises of the company, is to say nothing affecting the questions involved in the case. This is a statutory corporation; and the clear modern doctrine is, that it has no power except that which the statute directly or by fair implication gives. (*Perrine* v. *Chesapeake and Del. Canal Co.*, 9 How. 184. See, also, *Wallace* v. *Mayor of San José*, 29 Cal. 186: *Zottman* v. *San Francisco*, 20 Cal. 102, 109; *Branham* v. *Mayor, etc., of San José*, 24 Cal. 604; *Bank of Augusta* v. *Earle*, 13 Pet. 587; *City of Oakland* v. *Carpentier*, 13 Cal.

545; *Head* v. *The Providence Insurance Co.*, 2 Cranch, 127; *Bank of U. S.* v. *Dandridge,* 12 Wheat. 64; *Dartmouth College* v. *Woodward*, 4 Wheat. 636.)

To decide, therefore, whether the deed in question was within corporate power, we must look to plaintiff's charter alone. The certificate of incorporation states the purposes of the company as follows:

"The object for which the said company is formed is to direct the waters running in the bed of the Middle Yuba, at or near a point one thousand six hundred yards above the Forks, and by means of a canal or canals, to be constructed by the south side of said Middle Yuba, and supply the miners of.Snow Point, Orleans, Moore's and Woolsey's Flats, and other places along said ridge with water, and employ said water for mining, manufacturing, and mechanical purposes."

The statute (1 Hittell, Art. 933) says the certificate shall state "the object for which the company shall be formed, the amount of its capital stock," etc.; and (Art. 935) that, after the certificate is filed and the corporation thereby created, it shall have power "to purchase, hold, sell, and convey such real and personal estate as the purposes of the corporation shall require;" and (Art. 944) that "it shall not be lawful for the Trustees to make any dividend except from the surplus profits arising from the business of the corporation, nor to divide, withdraw, or in any way pay to the stockholders, or any of them, any part of the capital stock of the company; nor to reduce the capital stock, unless in the manner prescribed in this Act."

This being so, it is a matter of law and not of fact whether a corporate act be within the purposes of the corporation. We say, as matter of law on the papers, that this sale is beyond the purposes and objects of the corporation, because it is suicide. How could the company supply the localities named with water from the Yuba when it had stripped itself

of all the means of so doing, and received nothing in return? This sale was a transfer of the corporate powers of the plaintiff, for the ditch and water right are a part of the franchise. All sales of corporate property, to be valid, must be to effect the purposes of the corporation, and where a sale destroys instead of carrying out these purposes, it is *ultra vires* and void. We cite the leading cases in support of the principles contended for by appellant: *Abbott v. American Hard Rubber Co.*, 33 Barb. 578, 593; *Bissell v. M. S. & N. I. R. Co.*, 22 N. Y. 281—opinion of Selden; *Pearce v. Madison & I. R. Co.*, 21 How. 441; *York and Md. Line R. Co. v. Winans*, 17 How. 30; *Dodge v. Woolsey*, 18 How. 341, 343; *Hood v. New York and N. H. R. Co.*, 22 Conn. 502; *Penn. Del. and Md. Steam Nav. Co. v. Dandridge*, 8 Gill. & J. 318, 319; *Abbot v. Baltimore and Rapp'k S. P. Co.*, 1 Md. Ch. 542; *Coe v. Columbus and P. and I. R. R. Co.*, 10 Ohio St. 377, 378, 390, 402, 403; *Ohio and M. R. R. Co. v. I. R. R. Co.*, 5 Am. Law Register, N. S., 733—October, 1866; *Clark v. City of Des Moines*, Am. Law Register for January, 1867, and note; *Robbins v. Clay*, 33 Me. 132; *Kean v. Johnson*, 1 Stockton Ch. 401; *Bank of Commerce v. Bank of Brest*, Harrington's Ch., Mich., 401; *New Orleans, J. and G. N. R. Co. v. Harris*, 27 Miss. 517, 541; *Brady v. The Mayor*, 2 Bosw. 185, 187; *Brady v. The Mayor*, 20 N. Y. 319; *Ward v. Sea Ins. Co.*, 7 Paige, 297; *Johnson v. Brush*, Barb. Ch. 237, 240, 241; *New York and Sharon Bank v. Fulton Bank*, 7 Wend. 412; *Life and Fire Ins. Co. v. Mechanics' Ins. Co.*, 7 Wend. 35; *Madison, W. and M. P. R. Co. v. Watertown and P. R. Co.*, 7 Wis. 59; *Steevens v. Rutland and B. R. Co.*, 29 Vt. 545; *Hodges v. City of Buffalo*, 2 Denio, 113; *McCullough v. Moss*, 5 Denio, 578; *McSpedon v. Mayor of New York*, 7 Bosw. 601, 610; *Zottman v. San Francisco*, 20 Cal. 102, 109; *Wallace v. Mayor of San José*, 29 Cal. 186, 188; *Branham v. Mayor of San José*, 24 Cal. 604; *East Anglian R. Co. v. Eastern Counties Railway Co.*, 7 E. L. & E. 505; *Beman v. Rufford*, 6 E. L. & E. 106; *Winch v. Birkenhead and Lancaster R. Co.*, 13 E. L. & E., 506; *MacGregor v. Official Manager of Deal and Dover R. R. Co.*, 16 E. L. &

E. 180; *Coleman* v. *Eastern Counties Railway*, 10 Beav. 1—
approved in 24 How. 443; *Great Northern R. Co.* v. *Eastern
Counties R. Co.*, 12 E. L. & E. 224; *Munt* v. *Shrewsbury and
Chester R. Co.*, 3 E. L. & E. 144; Angell & Ames on Corp.,
Secs. 391, 393; Redfield on Railways, 418; Pierce on Ameri-
can Railroad Law, 397, 404, 511, 513.

The foregoing present an unbroken line of authority to
these points :

First—That corporations are the mere creatures of the
statute, and can hold or sell property only for the purposes
for which they were created.

Second—That pecuniary benefit constitutes no element in
solving the question whether a given act be within the pur-
poses of the charter; that, in such cases, the question is one
of power and public policy.

Third—That any corporate act which adds to the powers
of the corporation, or transfers the exercise of those powers
to another, is void, even though such addition or transfer
increase the public and private benefits of the corporation.

Fourth—That a sale of all the property of a ditch corpora-
tion, including its water right, and a cessation of business,
*per se*, destroy the capacity of the corporation to carry out
the purposes of its creation; and such sale is therefore void,
and the fact that the corporation may still have a technical
existence is immaterial.

Fifth—That the sale in this case, consisting in a transfer
of the entire property of plaintiff to a new corporation, with
different capital stock, issued to the stockholders of plaintiff
on a new basis, amounts to an increase or diminution of the
stock of plaintiff, and to a dividend thereof and a distribu-
tion of its property, in direct violation of the charter, and is
therefore void.

The sale in question being *ultra vires* and void, the corpora-
tion is not estopped to set up its nullity.   (*Hood* v. *The New
York and New Haven R. Co.*, 22 Conn. 508; *Green* v. *Seymour*,
3 Sandf. Ch. 292; *Ohio and Michigan Railroad Co.*, v. *I. and
C. Railroad Co.*, Am. Law Register, October, 1866, p. 739; 8

Gill & Johns. 318; 1 Md. Ch. 542; 7 Wis. 59; 3 Barb. Ch.
241; 7 E. L. & E. 508; *Clark* v. *City of Des Moines*, Am.
Law Register, January, 1867, p. 150.)

The idea has been sometimes erroneously thrown out that
the Government only can take advantage of these void acts
of corporations.    The point is here :  The *charter* cannot be
*forfeited* for these, which are acts *ultra vires*, except by the
State; but the law pronounces the acts void whenever called
to the attention of the Court.    The forfeiture is an additional
penalty.

The deed of October 29th, 1860, was void, because not
authorized by the Board of Trustees met as a Board.    (1
Hittell, Art. 938; *Gashwiler* v. *Willis*, 33 Cal. 11; *Conro* v.
*Port Henry Iron Co.*, 12 Barb. 62, 63; 4 Johns. Ch. 597;
*Ross* v. *Crocket*, 14 La. Ann. 811; Angell & Ames on Corp.
Secs. 232, 279.)

*Joseph P. Hoge, A. C. Niles,* and *D. Belden,* for Respon-
dents.

We contend that the corporation, plaintiff in this case,
is not in a condition to raise the question attempted to be
raised.    It is estopped to deny the validity of the deed of
1860, or to go behind its execution and deny the authority
of the Trustees executing it, upon some supposed failure to
comply with preliminary formalities.    (*Curtiss* v. *Leavitt,* 15
N. Y. 47.)    If the power could have been exercised under
any given state of facts, and it has been exercised, third per-
sons dealing with the corporation have a right to suppose
that the given state of facts existed, and then the whole
doctrine of acquiescence and ratification is directly applica-
ble.    This is the doctrine of all the authorities.    If the act
is within the corporate powers, then, however irregularly
performed, it may be cured by acquiescence of the corpora-
tion.    (*Bank of the United States* v. *Dandridge,* 12 Wheat. 64;
*Bank of Columbia* v. *Patterson's Administrator,* 7 Cranch, 299;
*Bank of Northern Liberty* v. *Cresson,* 12 Sergt. & R. 313; *Pro-*

*prietors of Canal Bridge* v. *Gordon,* 1 Pick. 296; *Danforth* v. *Schoharie Turnpike Co.,* 12 Johns. 227; *Randall* v. *Van Vechten,* 19 Johns. 59; *Mott* v. *Hicks,* 1 Cow. 513; *Dunn* v. *St. Andrew's Church,* 14 Johns. 117; *Zabriskie* v. *The Cleaveland, Columbus and Cincinnati R. R. Co.,* 23 How. U. S. 281; *Knox County* v. *Aspinwall,* 21 How. U. S. 545; *Bissell et al.* v. *City of 'Jeffersonville,* 24 How. 287; *Gelpecke* v. *City of Dubuque,* 1 Wallace, 203, 223; *Van Hostrup* v. *Madison City,* 1 Wallace, 297; *Meyer* v. *City of Muscatine,* 1 Wallace, 393.) The case of *Hoyt* v. *Thompson,* 19 N. Y. 207, is a very elaborate decision, and fully sustains the views we take. (See, also, *Bulkeley* v. *The Derby Fishing Co.,* 2 Conn. 252; *Hoyt* v. *Shelden,* 3 Bosw. 294; *Miller et al.* v. *Rutland and Washington R. R. Co.,* 36 Vt. 452; *Degroff* v. *American Linen Thread Co.,* 21 N. Y. 127; *Parish* v. *Wheeler,* 22 N. Y. 502—Comstock's opinion; *Bargate* v. *Shortridge,* 31 Eng. Law & Eq. 51—opinion of Lord St. Leonard; *Gordon* v. *Preston,* 1 Watts, 387; and *Chapman & Harkness* v. *Mad River, etc., R. R. Co.,* 6 Ohio St. 119.)

. But the main argument of the counsel for the plaintiff is based upon the proposition that the sale and conveyance of the Miners' Ditch Company was absolutely void on its face—beyond the corporate power—"*ultra vires* in the extreme sense." That is to say, the proposition is that a corporation in this State cannot sell its entire property under any circumstances. The particular consideration of the sale is of no consequence, as the objection strikes at the power itself. It does not exist. The whole power of the corporation is incapable of effecting the object. No stockholder complains. The case shows that they have received the consideration of the sale, and are satisfied. Indeed, it is not perceived why the objection now under consideration would not be equally valid, equally fatal, notwithstanding every stockholder, without exception, had approved of the sale, united in it, and done everything necessary to lend it sanction. It is a question of power in the corporate body. How can the unanimous consent of every branch of the body, of every person connected with or interested in the corporation, import into

the body a power which its incorporating Act denies it? And yet those who contend for this doctrine of inability to sell always admit that it can be done by the unanimous consent of the stockholders. In truth, it is because the power exists, and, if suffered to be exercised, would convey the property, that Courts of equity are so often appealed to to prevent its exercise; and the cases cited are generally of that character. Relief is sought against the improper and fraudulent exercise of an existing and essential power by the preventive action of Courts of chancery.

Every corporation, as such, has the capacity to take and grant property, and to contract obligations, in the same manner as an individual. But the general powers incident to a body corporate, at common law, are restricted by the nature and object of the institution of each. So that, at common law, the restriction of the powers of the corporation to the objects and purposes of the institution existed, which the counsel supposes was introduced only by statutory provision. (*Berry* v. *Merchants' Exchange Co.*, 1 Sandf. Ch. 288, 295; *Bank of Northern Liberty* v. *Cresson*, 12 Sergt. & R. 313.)

The power of a corporation to sell is co-extensive with its power to purchase; or rather, whatever it owns or can own it can dispose of, being itself the judge in each instance as to the circumstances and inducements under which it will exercise the power, and being responsible only to its stockholders for the *bona fides* of its action, and to the State when it violates its chartered privileges. As to all third persons acting in good faith, its power of disposition is of necessity unlimited. (2 Kent's Com., 11th Ed., 327, 328; 1 Kyd, 108; *Barry* v. *Merchants' Exchange Co.*, 1 Sandf. Ch. 293; *The Mayor, etc., of Colchester* v. *Lowton*, 1 Ves. & Bea. 226, 237, 240, 244; *Pierce* v. *Emery*, 32 N. H. 503; *Treadwell* v. *Salisbury Manufacturing Co.*, 7 Gray, 404; *Binney's Case*, 2 Bland, 142; 1 Vesey, Belt's Sup., 226.) The same principles are maintained in the cases of *Sargent* v. *Webster*, 13 Met., Mass., 497; *Hodges* v. *New England Screw Co. et al.*, 1 R. I. 312; *The*

Cal. Reps. XXXVII—72

*Banks* v. *Poitiaux*, 3 Randolph, 136; and *Lauman* v. *The Lebanon Valley R. R. Co.*, 30 Penn. St. 42.

The whole question has been repeatedly decided in cases of deeds of trust. (*Dana* v. *The Bank of the United States*, 5 Watts & S. 243; *The State of Maryland* v. *President and Directors of the Bank of Maryland et al.*, 6 Gill & Johns. 205; *Union Bank of Tennessee* v. *Ellicott et al.*, 6 Gill & Johns. 363; *Lord* v. *The Governor and Co. of Copper Miners*, 22 Eng. Ch. 739; and *Gordon* v. *Preston*, 1 Watts, 386.)

In this case the corporation, plaintiff, seeks to avoid its own deliberate act upon the plea that it exceeded its corporate powers; that it was guilty of a misuser of its franchise by overworking its unquestionable power to sell. We respectfully submit that it is not competent for the corporation itself to raise this objection. It cannot be permitted to impeach its own acts in this way. The corporation cannot take advantage of its wrong. It is estopped by its own acts. If this sale be a misuser of its franchise, it is a cause of forfeiture; and it is settled that a cause of forfeiture can be taken advantage of by the Government alone, and in a proceeding instituted for the purpose. (*Leazure* v. *Hillegast*, 7 Sergt. & Rawle, 312; *Baird* v. *Bank of Washington*, 11 Sergt. & Rawle, 418; *Goundie* v. *Northampton Water Co.*, 7 Barr, Penn. St. 239; *Banks* v. *Poitiaux*, 3 Randolph, 136; *Silver Lake Bank* v. *North,* 4 Johns. Ch. 370; *Barrow* v. *Nashville and Charlotte Turnpike Co.*, 9 Humphreys, 304; *Fleckner* v. *The Bank of the United States*, 8 Wheat., 5 U. S. Cond., 463, 464.)

By the Court, SAWYER, C. J.:

The Miners' Ditch Company, plaintiff in this action, has been since 1859 a corporation under the laws of California, "its object being the building and maintaining of water ditches, and the sale of water in said Nevada County." In May, 1859, said corporation owned the property in controversy, consisting of the "Miners' Ditch," the "Poorman's Ditch," and the "Grizzly Ditches." At that time there was another

similar corporation, owning similar property, in the same vicinity, called "The Eureka Lake Company," both supplying the same market. The property and business of the two corporations being similar, and a number of persons being members and stockholders in both, it was agreed, in May, 1859, by both, that the property of the two corporations should be thrown together and managed in common, and should be owned in the proportions of two shares to the Miners' Ditch Company, and three to the Eureka Lake Company. Certain improvements were to be made by each corporation on its own original property, and each was to pay its own debts. The two corporations commenced acting together on the 29th of June, 1859. The property of both was at that time put into the hands of common agents, who had the full management and control of the property and business down to the Fall of 1860, the business being done under the name of the Eureka Lake and Miners' Ditch Companies. During this time, large amounts of money were expended in improving the common property, and other property of a similar character was acquired. This arrangement was only intended to be temporary. It was then proposed to form a new corporation, to be organized by the stockholders of the two old ones, to which the property of both old corporations should be conveyed.

At a meeting of the stockholders of the Eureka Lake Company, held on the 3d of September, 1860, it was resolved that a new corporation, to be called the "Eureka Lake Water Company," should be formed, and that the Eureka Lake Company should convey to it all its property, on condition that the Miners' Ditch Company, the plaintiff in this case, should do the same, and that the stock of the new corporation should be credited to the stockholders of the two old corporations, in the proportions agreed upon. On the second Saturday of September, 1860, there was a regular meeting of the stockholders of the Miners' Ditch Company, which was adjourned for two weeks. At or about the time appointed for the adjourned meeting, there was a meeting of either the

stockholders, or the Trustees, or both. The testimony does not show clearly the exact character of this meeting, that is, whether it was of the stockholders or Trustees; but it is clear, that there was a meeting of either the one or the other, or both. At this meeting there was a resolution passed, authorizing the Trustees to convey the property of the Miners' Ditch Company to the corporation to be formed, viz: "The Eureka Lake *Water* Company." On or about the 29th of October, 1860, a deed bearing that date was executed by the Trustees of the Miners' Ditch Company to the Eureka Lake *Water* Company, conveying all the property of the former to the latter, including the property described in the complaint, except the Malakoff Ravine and Eureka Lake sawmill, which were subsequently acquired. This deed purports upon its face to be a deed of the Miners' Ditch Company, as a corporation, has the corporate seal annexed, and is signed as Trustees and duly acknowledged by James B. Henry, George C. Powers, James Cregan, George Fellows, and Robert McKerrow, who were, at the time, the Trustees of the corporation. The deed was duly recorded in the Recorder's office of said county, on the 11th of November, 1861. The Eureka *Lake* Company, having been advised that their incorporation had never been legally perfected, on the 25th of October, 1860, individually executed a deed, which was duly recorded, purporting to convey the property of said company to the "Eureka Lake Water Company." On the 14th of November, 1860, the "Eureka Lake *Water* Company," having been duly organized as a corporation under the laws of this State, took possession of the property of the "Miners' Ditch Company" and "Eureka Lake Company," conveyed and attempted to be conveyed by said two deeds, and from that time to January, 1863, had full possession and control of the same, claiming it as its own under said deeds, and no one interfering with or disputing its title or possession. Immediately after the organization of the "Eureka Lake *Water* Company," stock books were opened, and stock issued to the members of the two old corporations in the

proportions agreed upon. After the Eureka Lake *Water* Company took possession, it expended large sums of money in improving the property and in paying off liens thereon. In 1862, the Eureka Lake *Water* Company executed to defendants, Zellerbach and Powers, a mortgage on all its property, including that described in the complaint, to secure the payment of the sum of two hundred thousand dollars. This was for money advanced, and to be advanced; and the whole sum of two hundred thousand dollars was advanced before January, 1863. The mortgage provides that the defendants might receive and apply the profits and income of the property to the satisfaction of the mortgage debt; and on the 3d of January, 1863, the Eureka Lake Water Company gave full possession and control of all the property to Zellerbach and Powers for that purpose. Zellerbach and Powers held full and uninterrupted possession under the arrangement until the 5th of February, 1865, at which time they acquired all the right of the Eureka Lake ·*Water* Company to the property by virtue of a Sheriff's deed, made on an execution sale under judgment recovered against said company by one Martin. Powers conveyed his interest, being one half, to defendant, Zellerbach, in September, 1865. Down to September, 1865, Zellerbach and Powers, and, from that time, Zellerbach, alone, have been in continued possession, holding under and as successors to the "Eureka Lake Water Company." Said mortgage has not been paid, nor have the rents and profits been sufficient to satisfy it. The "Eureka Lake Water Company" made large improvements on the property held by the Miners' Ditch Company described in the complaint, amounting in value to at least fifty thousand dollars. It also paid mortgages on said property, which had been created by the "Miners' Ditch Company," amounting to at least ninety thousand dollars. It does not appear affirmatively that the Trustees of the "Miners' Ditch Company," in corporate body assembled, formally authorized the execution of the deed to the Eureka Lake Water Company, or that it was executed at a formal meeting of the Board of

Trustees. It was executed, however, by the three Trustees, Henry, Powers, and Cregan, at one and the same time, and while they were together and in the presence of each other. The other two Trustees, George Fellows and Robert McKerrow, signed it separately and at another time. The by-laws of the Miners' Ditch Company do not contain any provisions about the meetings of the Trustees, and it does not appear how they were called or held, or in what manner they usually transacted their business. The certificate of incorporation of the Miners' Ditch Company contains the following statement of the objects and purposes of the company: "The objects for which the said company is formed is to divert the waters running in the bed of the Middle Yuba, at or near a point one thousand six hundred yards above the Forks, and by means of canal or canals, to be constructed by said company, to carry said water along the ridge of the south side of said Middle Yuba, and supply the miners of Snow Point, Orleans, Moore's and Woolsey's Flats, and other places along said ridge, with water, and employ said water for mining, manufacturing, and mechanical purposes."

From the date of the deed in October, 1860, the Trustees of the Miners' Ditch Company did not meet again, as a Board, until October, 1865, and during that time did not pretend to do any business, or to set up any claim to, or control of, the property described in the complaint; and it had knowledge that the Eureka Lake Water Company, and afterwards Zellerbach and Powers, had possession of the property, and claimed ownership of the same under the said deed from the Miners Ditch Company. All the premises described in the complaint, as well as the other property claimed by defendants, and also various other ditches owned by other companies, are situate on the ridge which divides the waters of the Middle and South Forks of the Yuba River; nearly all the stockholders of the Miners' Ditch Company lived on said ridge at the time of the transfer of the property to the Eureka Lake Water Company; the sale and transfer were public and notorious events; a majority of the stockholders

had actual notice of the transaction, and all are chargeable with such notice. No objection was made to the asserted title of the Eureka Lake *Water* Company, or its possession, by the Miners' Ditch Company, or by any one of its Trustees or agents, until the Fall of 1865, a short time before this suit was commenced. All the property described in the complaint is situate on the public domain of the United States, and is held by possessory title alone.

The foregoing are the facts, substantially, as found by the Court below. It also finds, as a fact, that the property described in the deed of October, 1860, was not essential to the business and existence of the Miners' Ditch Company, but adds: "I look upon the question, however, as scarcely one of pure fact; and prefer finding the real facts upon the point. They are these: after the company had sold all its property, of course it could not have done any more business in the matter of mining or selling water, without acquiring another water right and ditch, by purchase or by location and construction; it might have purchased other ditches and water rights in the same vicinity; it might, also, have located another water right in the same stream to which its original ditch was constructed, and might have built a new ditch. It would have thus obtained a supply of water in the wet season, but not in the dry season; and the project of building a new ditch would probably not have been profitable."

The general statute, under which these several corporations were organized, provides that the certificate filed shall, among other things, state " the objects for which the company shall be formed" (Stats. 1859, p. 93, Sec. 2); that it shall have power "to purchase, hold, sell, and convey such real and personal estate as the purposes of the corporation shall require" (Stats. 1853, p. 87, Sec. 4); and that "it shall not be lawful for the Trustees to make any dividend except from the surplus profits arising from the business of the corporation, nor to divide, withdraw, or in any way pay to the stockholders, or any of them, any part of the capital stock of the company, nor to reduce the capital stock, unless

in the manner prescribed in this Act; and in case of any violation of the provisions of this section, the Trustees, under whose administration the same may have happened, except those who may have caused their dissent therefrom to be entered at large on the minutes of the Board of Trustees at the time, or were not present when the same did happen, shall, in their individual and private capacities, be jointly and severally liable to the corporation, and the creditors thereof, in the event of its dissolution, to the full amount so divided, withdrawn, paid out, or reduced; provided that this section shall not be construed to prevent a division and distribution of the capital stock of the company, which shall remain after the payment of all its debts, upon the dissolution of the corporation or the expiration of its charter." (Stats. 1853, Sec. 13.) The objects for which the Miners' Ditch Company was formed, as set forth in the certificate, have already been stated among the facts found by the Court.

The first point made by the appellant is: "The consolidation of the Miners' Ditch Company and the Eureka Lake Company, by a mutual transfer and sale of their respective ditches and water rights to the Eureka Lake Water Company, in consideration of shares therein issued to the stockholders of the two former companies in proportions of two fifths and three fifths, was *ultra vires*, and therefore void." In support of the point it is argued that the transfer of all the said property of the Miners' Ditch Company was not in pursuance of the "purposes of the corporation," but was, on the contrary, destructive of those purposes, and therefore not in pursuance of the powers conferred. If wrong in this view, that then the transfer of the property of the two old corporations to the Eureka Lake Water Company, in pursuance of the understanding had between the stockholders of the two old corporations, and in payment therefor receiving certificates of stock and distributing the same among the several stockholders of the old corporations in the proportions agreed upon, was in substance withdrawing and dividing among the stockholders the capital stock of the old

corporations, contrary to the provisions of said thirteenth section.

In thus ingeniously grouping together in his point and argument several particulars, and constantly exhibiting them to the mind at one view, as a whole, counsel doubtless presents his case in its most plausible and formidable aspect. But in this case, as in most others, in order to attain correct conclusions it is necessary to consider separately every element that may affect the general result. In considering the cases in which the law applicable to corporations is discussed, it must, also, always be borne in mind that there are several classes of rights to which they apply, and that upon the same general state of facts, the legal consequences might be different with reference to the different classes of rights. Thus there are corporate rights—that is to say, rights which pertain to the corporation, *as such*—the artificial legal entity created by the Act of incorporation, considered as a single, distinct person; individual rights of the stockholders *as such*, and rights of the creditors of the corporation. The rights of strangers dealing with the corporation may vary according as they are considered with reference to the corporation itself, the stockholders, or the creditors of the corporation. So, also, there are several classes of corporations, such as public municipal corporations, the leading object of which is to promote the public interest; corporations technically private, but yet of a *quasi* public character, having in view some great public enterprise, in which the public interests are directly involved to such an extent as to justify conferring upon them important governmental powers, such as an exercise of the right of eminent domain. Of this class are railroad, turnpike, and canal companies; and corporations strictly private, the direct object of which is to promote private interests, and in which the public has no concern, except the indirect benefits resulting from the promotion of trade, and the development of the general resources of the country. They derive nothing from the Government, except

the right to be a corporation, and to exercise the powers granted. In all other respects, to the extent of their powers, they stand upon the footing of natural persons, having such property as they may legally acquire, and holding and using it ultimately for the exclusive benefit of the stockholders. In this last class, the stockholders and those dealing with the corporation, are the only parties directly and immediately interested in their acts, so long as the corporation confines itself within the general scope of its powers. The rights of the corporation, the corporators, and of strangers dealing with the corporation, may, in some respects, vary according to the circumstances surrounding a given transaction.

The term *ultra vires*, whether with strict propriety or not, is, also, used in different senses. An act is said to be *ultra vires* when it is not within the scope of the powers of the corporation to perform it under any circumstances, or for any purpose. An act is also, sometimes, said to be *ultra vires* with reference to the rights of certain parties, when the corporation is not authorized to perform it without their consent; or with reference to some specific purpose, when it is not authorized to perform it for that purpose, although fully within the scope of the general powers of the corporation, with the consent of the parties interested, or for some other purpose. And the rights of strangers dealing with corporations may vary, according as the act is *ultra vires* in one, or the other, of these senses. All these distinctions must be constantly borne in mind in considering a question arising out of dealings with a corporation. When an act is *ultra vires* in the first sense mentioned, it is generally, if not always, void *in toto*, and the corporation 'may avail itself of the plea. But when it is *ultra vires* in the second sense, the right of the corporation to avail itself of the plea will depend upon the circumstances of the case. Cognate questions were very thoroughly and ably discussed by Mr. Justice Comstock and Mr. Justice Selden, in *Bissell* v. *The Michigan Southern and Northern Indiana Railroad Companies*, 22 N. Y. 262, the latter dissenting from many of the views of the former, but both

agreeing in the views just expressed with reference to acts *ultra vires* in the last sense mentioned. Mr. Justice Comstock says: "Circumstances may, and often do, exist, which estop the offender from taking advantage of his own wrong. The contract may be entered into on the other side without any participation in the guilt, and without any knowledge even of the vice which contaminates it. An innocent person may part with value, or otherwise change his situation, upon the faith of the contract. A railroad corporation, for example, may purchase iron rails and give its obligation to pay for them with a design to sell them again on speculation, instead of using them for continuing its track. Such a transaction is clearly unauthorized, and is, therefore, said to be illegal. But if the corporation is deemed to make the contract—in other words, if, as I have above shown, it is a legal possibility for corporations to make contracts outside of their just powers, how can its illegality be set up against the other party, who knows nothing of the unlawful purpose? So an incorporated bank may purchase land, having power to do so for a banking house, but actually intending to speculate in the transaction. This is, also, *ultra vires*, but can the want of authority be interposed in repudiation of a just obligation to pay for the same land, the vendor not being *in pari delicto ?* Such a doctrine is not only shocking to the reason and conscience of mankind, but it goes far beyond the law in regard to the illegal contracts of private individuals." Again: "That term (*ultra vires*) is of a very modern invention, and I do not think it well chosen to express the only principle which it can be allowed to represent in cases of this nature. It is not to be understood as an absolute and peremptory defense in all cases of excess of power without regard to other circumstances and considerations." (*Ib.* p. 275.) Mr. Justice Selden (whose views the appellant's counsel seems to approve) says in the same case: "There are, no doubt, cases in which a corporation would be estopped from setting up this defense, although its contract might have been really unauthorized. It would not be available in a suit brought

by a *bona fide* indorsee of a negotiable promissory note, provided the corporation was authorized to give notes for any purpose; and the reason is, that the corporation, by giving the note, has virtually represented that it was given for some legitimate purpose, and the indorsee could not be presumed to know the contrary. The note, however, if given by a corporation absolutely prohibited by its charter from giving notes at all, would be voidable not only in the hands of the original payee, but in those of any subsequent holder, because all persons dealing with a corporation are bound to take notice of the extent of its chartered powers."

The same principle is applicable to contracts not negotiable. (22 N. Y. 289.) Mr. Justice Selden also cited the following passage from the opinion of Lord St. Leonards: "The opinions of some of the Judges in the *Norwich Case* favor the disposition which I feel to restrain the doctrine of *ultra vires* to clear cases of excess of power with the knowledge of the other party, express or implied from the nature of the corporation and of the contract entered into;" and adds: "To this I agree." (*Ib.* 301.) The consequence of the distinction we have taken in respect to contracts, *ultra vires* in the different senses indicated, is fully recognized by the English authorities, as well as our own, and, as it is important, and the reasoning can be no better stated in any language we may select, we shall make some extracts from the opinions in the English cases. In *Mayor of Norwich* v. *Norfolk Railway Company*, 30 E. L. & Eq. 128, Mr. Justice Earle says: "The doctrine (relating to defense of *ultra vires*) was introduced at law by the *East Anglian Railway Company Case*, and the contract there in question being a contract by one railway company to pay the costs of another railway, incurred in applying to Parliament, was judicially perceived from the terms of the contract itself, to be necessarily unconnected with the purpose of the defendant's incorporation, and, therefore, prohibited. This is the point decided in the case. Looking to the report, with the remarks in the argument, I understand the Court to have meant, that any application

of the funds, and any contract which, in the knowledge of the party, who should sue upon the contract, was intended for a purpose unconnected with the purpose of incorporation, was prohibited; and that, where the contract itself appeared to be necessarily unconnected with the purpose of incorporation, both the parties must have known it to be so, and the Court judicially perceive it to be void; and that, if the contract was not necessarily so unconnected, the ground of illegality must be averred and found in the usual way, before it could be a ground of judgment; and that no application of the funds and no contract was prohibited by implication, which the parties intended to be connected with the purpose of incorporation, however distant the connection might be. The question put in the course of the argument, 'Would a contract by a railway company for a theatre or chapel be void?' exemplifies the doctrine."

"It would or would not, according as the purpose of the contracting parties was or was not connected with the railway. It might be a speculation separate from the railway, and prohibited. Or, if works were wanted in a waste place, and the company found it for their interest to build a town and supply it with all requisites for inhabitancy, and, in order to secure a permanent supply of workmen of skill and responsibility, added a chapel and a theatre, with religious and secular instruction, it might be for the purpose of the railway, and valid, and, though distantly connected, the outlay might be found eventually to increase the profit from the traffic." Again: "The case of *McGregor* v. *The Dover and Deal Railway Company*, 17 Jur. 21, S. C. 16, E. L. & Eq. 180, shows that the question at law is whether the contract was prohibited, not whether it was made in excess of the authority given to the Directors. There the contract of McGregor, that the railway company should pay costs, was held void, because such a payment by the company was prohibited by law. If a contract by the company for such a payment would have been merely an excess of authority, the contract of McGregor would have bound himself, and would not have

been absolutely void.   The expression that the contracts, which are held null within the doctrine in question, are void because they are *ultra vires*, seems to imply that the Courts of law, in an action against a corporation upon a contract duly made and valid in form, compare the contents of the contract with the powers supposed to be given to the Directors by the shareholders, either in the capacity of agents for them or by the statute, and hold it void if there is an excess beyond those supposed powers." (*Ib.* 130, 131.)

So the same Justice recognizes the difference between cases where stockholders are suing in equity to restrain a misappropriation of the corporate funds, and a suit on a contract against the corporation by a stranger.   "In these suits in equity the members of the corporation, in their individual capacity, are considered to have rights *inter se* analogous to those of partners *inter se*, and the Act incorporating the company is considered to be analogous to a partnership deed (see the judgment of Sir G. J. Turner, L. J., in *Simpson* v. *Denison*, 10 Hare, 51; *Simpson* v. *Denison*, 13 E. L. & Eq. 359); and the question is, whether the misapplication is so unreasonable in kind and degree as to require the interference of the Court for the protection of the complaining party. From these suits passages have been cited, in which the Judges have expressed opinions on the expediency of checking with much strictness the Directors of incorporated companies having extensive powers and large capital, opinions which might be highly reasonable with reference to shareholders complaining of over speculation on the part of the Directors at their cost;   but they seem unreasonable and iniquitous if applied to the administration of the law in actions to which such corporations are parties.   These suits in equity between different members of the company bear no analogy to actions at law by third persons against the corporation, either in respect of the parties to the suit, or the subject in litigation.   As to the parties in actions against corporations, the members thereof, in their individual capacity, are strangers to the suit; and the rights of persons who

contract with corporations are unaffected by the rights of members *inter se.*" (*Ib.* 130.) Lord Campbell, also, in the same case, says: "The mere circumstance of a covenant by Directors in the name of the company, being *ultra vires* as between them and the shareholders, does not necessarily disentitle the covenantee to sue upon it. For example, if the Directors of a railway company were to enter into a contract under the seal of the company for the purchase of a large quantity of iron rails, and to pay for them at a fixed price, as the vendor had reasonable ground for supposing that the rails were wanted for the purposes of the railroad, it would be no defense to an action for the price, or for not accepting them, that the rails were illegally purchased on speculation, to be resold by the Directors for their own profit. But suppose that the Directors of a railway company should purchase a thousand gross of green spectacles as a speculation, and should put the seal of the company to a deed covenanting to pay for these goods, here would be a clear excess of authority on the part of the Directors; this excess of authority would necessarily be known by the covenantee, and he being *in pari delicto,* I conceive that the maxim would apply, '*potior est conditio possidentis.*' This would be an illegal contract to misapply the funds of the company, and the illegality might be set up as a defense." (*Ib.* 143, 144.) There was no difference between the Judges as to these principles, although there was a disagreement as to whether by comparing the contract with the statute, it appeared upon its face to be *ultra vires.* So, in *Eastern Counties Railway Company* v. *Hawkes*, 35 E. L. and Eq. 9, which was a suit to compel the railway company to specifically perform a contract for the purchase of lands from Hawkes, the complainant in the Court below. The corporation, among other defenses, insisted that the contract was *ultra vires.* A specific performance was decreed by the Vice Chancellor, which decree was affirmed by the Lord Chancellor, on appeal, and again by the House of Lords on appeal from his decree. In the House of Lords, Lord Chancellor Cranworth said: "A small portion only of it, about

an acre and a half, is within the line of deviation, and it was argued that a contract to purchase the whole (nearly six acres) was a contract *ultra vires*, inasmuch as the company could only purchase what was really necessary or proper for the construction of the line. But the answer to this argument appeared to me satisfactory. The contract was necessarily and on the face of it *ultra vires*. If the land in question was really wanted by the appellants for what are called extraordinary purposes, they were authorized to purchase it. Besides, the line of deviation actually cuts the respondent's house in two, and in such circumstances the appellants had no right to take a part without taking the whole, if the plaintiff required them to do so; and it is a reasonable inference that the contract to purchase the whole was made, because, wanting what was within the limits of deviation, the Directors knew that they could not stop short with what was within those limits. Be that, however, as it may, there was nothing to show the respondent that his land was not wanted for the legitimate objects of the company, and in such a case it cannot be permitted to the Directors to allege that the contract was invalid as beyond their powers; for, as argued at the bar, it would be no answer to an action for iron rails bargained and sold that the contract had been entered into, not in order to obtain rails for the use of the line, but in order to keep them in hand for the purpose of a future use, on a speculation that iron was likely to rise in value. I consider, therefore, that this second objection is as untenable as the first." (35 E. L. & Eq. 19.) And Lord Campbell said: "There can be no doubt that, as between the Directors and the shareholders, it would have been *ultra vires* for the Directors to put the seal of the company to such a contract. They could not lawfully apply the funds of the company to the making of the line either under the Act of the 10 or 11 Vict. c. 235, or any of their prior acts, and the respondent having full notice that they were exceeding their powers, and were guilty of a breach of trust, he could not have enforced the contract either at law or in

equity. But upon the face of the contract itself there is no reference whatever to the 'direct diverging line.' The recitals and the operative part of the contract refer only to the main line between Wisbach and Spalding, and to the 'curvilinear line' of junction delineated upon the Parliamentary plan; nor is there any evidence to prove that the respondent was a party to the scheme alleged to have been formed by agents of the company to deceive Parliament by abandoning the curvilinear and substituting an unauthorized direct line of junction with the Ambergate Railway." (*Ib.* 22.) And Lord St. Leonards also said: "Under this head (that the contract was *ultra vires*) the general question of the power of such companies to bind themselves was argued. Now this is a question between the appellants, bound by their contract under seal, and the party with whom they contracted. It is not a question between them and their shareholders, but, as was observed in *Edwards* v. *The Grand Junction Railway Company*, 1 Myl. & Cr. 674, the Court cannot recognize any party interested in the corporation, but must look to the rights and liabilities of the corporation itself. The covenant of the company is binding on the face of it, and the appellants must show, if they can, why it should not be so. Here they were properly bound. The property was within the bill as brought in, and within the Act as passed, and if the property in question had not been purchased before the Act, it might have been bought after the Act passed. It is no objection that the whole was not within the compulsory powers. The Land Clauses Act provides that no party shall be required to sell a part only of any house, if he is able and willing to sell and convey the whole. And to that extent, of course, the appellants might properly agree to purchase the whole of the house, although they required only a part of it. And at all events other parts of the property, according to the plans, would have been required for the railway, and the whole might have been required. I do not think that the contract can be

CAL. REPS. XXXVII—74

avoided by the appellants showing that they do not require the whole. Where Directors are acting in the obvious line of duty, as in this case, buying off an opposition, and acquiring property necessary or useful for the corporation, and the party contracting with such Directors is not aware of any intended misapplication on their part, I am of opinion that the contract is binding, although it can afterward be shown that the property really was not required for the railway. The safety of men in their daily contracts requires that this doctrine of *ultra vires* should be confined within narrow bounds." (*Ib.* 31.)

He further said: "My noble and learned friend showed that the mere circumstance of a covenant by Directors in the name of the company being *ultra vires* as between them and the shareholders, does not necessarily disentitle the covenantee to sue upon it," and expressed a disposition "to restrain the doctrine of *ultra vires* to clear cases of excess of power, with the knowledge of the other party, express or implied from the nature of the corporation and of the contract entered into." (*Ib.* 32.)

From the cases cited, it very clearly appears, that the question, as between stockholders and the corporation, is a very different one from that which arises between the corporation itself, and strangers dealing with it, and the principle established, where the contest arises between strangers and the corporation is, whether the act in question is one which the corporation is not authorized to perform under any circumstances, or one that may be performed by the corporation for some purposes, but may not for others. In the former case the defense of *ultra vires* is available to the corporation as against all persons, because they are bound to know from the law of its existence, that it has no power to perform the act. But in the latter case the defense may or may not be available, depending upon the question whether the party dealing with the corporation is aware of the intention to perform the act for an unauthorized purpose, or under circumstances not justifying its performance. And the test as

between strangers having no knowledge of an unlawful purpose and the corporation, is to compare the terms of the contract with the provisions of the law from which the corporation derives its powers, and if the Court can see that the act to be performed is necessarily beyond the powers of the corporation for any purpose, the contract cannot be enforced, otherwise it can. Or, in the language of Mr. Justice Selden, in the case before cited, "Where the want of power is apparent, upon comparing the act done with the terms of the charter, the party dealing with the corporation is presumed to have knowledge of the defect, and the defense of *ultra vires* is available against him. But such a defense would not be permitted to prevail against a party who cannot be presumed to have had any knowledge of the want of authority to make the contract. Hence, if the question of power depends not merely upon the law under which the corporation acts, but upon the existence of certain extrinsic facts resting peculiarly within the knowledge of the corporate officers, then the corporation would, I apprehend, be estopped from denying that which, by assuming to make the contract, it had virtually affirmed." (22 N. Y. 290.) Strangers are presumed to know the law of the land, and they are bound, when dealing with the corporations, to know the powers conferred by their charter. These are open to their inspection, and it is easy to determine whether the act is within the scope of the general powers conferred for that purpose. But they have no access to the private papers of the corporation, or to the motives which govern Directors and stockholders, and no means of knowing the purposes for which an act, that may be lawful for some purposes, is done. The very fact that the appointed officers of the corporation assume to do an act in the apparent performance of their duties, which they are authorized to perform for the lawful purposes of the corporation, is a representation to those dealing with them that the act performed is for a proper purpose. And such is the presumption of the law, and upon this presumption, strangers having no notice in fact

of the unlawful purpose are entitled to rely.   To this effect is the principle of the following, among other cases, as well as those already cited : *Commissioners of Knox County* v. *Aspinwall,* 21 How. U. S. 545, is a strong case applying this doctrine to public corporations; *Gelpecke* v. *City of Dubuque,* 1 Wallace, S. C. U. S. 203, and cases cited; *Bank of United States* v. *Dandridge,* 13 Wheat. 69.

Upon any other principle there would be no safety in dealing with corporations, and the business operations of these institutions would be greatly crippled, while the interests of the stockholders and the public, and their general usefulness, would be seriously impaired.   The officers are appointed by the corporation, and if any loss results to strangers dealing with the corporation from their misrepresentation in matters within the general scope of their duties, it should fall upon the corporation, which is responsible for their appointment, rather than upon parties who have no other means of ascertaining the facts, and must rely upon their assurances or not deal with the corporation at all.

The next step in the argument is to ascertain whether the " Miners' Ditch Company " had power to sell and convey its corporate property for any purpose; and upon this point we entertain no doubt.   We have already seen by the fourth section of the Act under which it was incorporated, that the corporation was empowered, " to purchase, hold, sell, and convey such real and personal estate as the purposes of the corporation shall require."   The power to sell and convey is as broad as its power to purchase and hold, and is granted in the same terms.   There is no complaint that the property was not properly acquired, and that the corporation legally owned it.   The *jus disponendi* necessarily attached as an incident to the ownership.   The very idea of private property, in which the public has no rights, involves the idea of a right to sell and convey, when the exigencies of the corporation require it.   If a corporation could convey a part, it could convey the whole.   The enterprise of the Miners' Ditch Company may have proved unprofitable, and rendered it necessary

to dispose of its assets, and wind up the concern, as the only means of avoiding insolvency. It might be necessary to sell and convey a part, or the whole of its property, in order to raise means to pay its debts and avoid a sacrifice by forced sale. In either event, the sale and conveyance of the property, with these objects in view, would be a lawful purpose of the corporation. Although the object for which it was formed was to construct a ditch, and convey water for sale to miners, and for mechanical purposes, there was no obligation resting on the corporation, to pursue this object, after it became evident, that the enterprise would be unprofitable, and result in insolvency, or loss. When such a result appears to be unavoidable, obviously, the only mode by which the interests of the parties, and of the public, could be subserved, would be to dispose of its assets in the most advantageous way, and pay off its debts, with a view to winding up the affairs of the corporation with the least possible loss. When a corporation of the kind in question is formed under our laws, no obligation to the public is assumed to carry on the business for which it was formed throughout the period specified in its certificate, whether the enterprise proves profitable or not. A corporation may forfeit its franchise by non-use, but a conveyance of property of the kind in question is not a transfer of its franchise. The District Judge in his opinion well says: "But the ditches and water rights were no part of the franchises; they were not given by the Legislature. The whole property was situate on the public domain, and could be acquired only by appropriation, or purchase. The Miners' Ditch Company did not acquire any right to, or property in, the ditches, or water right, by virtue of its incorporation. After its charter had been perfected, and the legislative grant of its franchise had fully vested, it still had not a foot of ditch, or an inch of water. Its property had then to be acquired in the same way that a natural person, without any franchises, could have acquired it. The case is entirely different from that of a railroad company, where a right of way, and other special rights in the nature

of property, are granted by the charter. The only special privilege which the Miners' Ditch Company received through its charter is simply the right to be a corporation, and thereby to do business in a manner different, in some respects, from that in which an ordinary association of natural persons may do business. A franchise was formerly said to be 'a branch of the royal prerogative, existing in the hands of a subject,' and it may still be defined to be a special grant by the sovereign power of a peculiar privilege whereby the recipient may do or enjoy something which in the exercise of the general rights of a subject or citizen he could not do or enjoy. But any citizen in the land might, by virtue of his general personal rights, have acquired everything mentioned in the deed. The conveyance, then, was not of any franchise of the corporation. It is claimed, however, that as the deed conveyed all the property of the corporation, it was, in effect, a transfer of corporate powers, because it left nothing upon which the corporate powers could be exercised; in other words, that it destroyed the existence of the corporation. But the property sold was not essential to the existence of the corporation. The corporation was in full existence the moment its charter was perfected, although at that time it had not, and could not have had, a dollar's worth of property; and the books are full of cases where it is held that a corporation still exists after all its property is gone. The Miners' Ditch Company, certainly, did not die upon the transfer of all its property, as the bringing of this suit witnesseth; and I presume that a defense to a suit brought by a corporation, on the ground that it had no property, and was therefore dead, would find no countenance in a Court."

This corporation was created for the immediate benefit of the stockholders, with no direct specific public purpose in view, as in the case of a railroad, or turnpike, or canal companies. The only interest the public has in the continuance of the business is the remote, general interest, which it has in the proper development of the resources of the country. The restrictions placed upon it, are for the purpose of giving

the public notice of its powers, of confining its business to
the line indicated in its certificate, and for protecting the
shareholders and parties dealing with it against the usurpa-
tion of its officers. The corporation is a distinct individual,
holding the legal title to the property in trust for the benefit
of the shareholders, who are the beneficiaries having the
equitable interest. If it is found from experience that the
interest of the corporators and creditors require that the busi-
ness should not be carried on upon so large a scale, or that it
should cease entirely, and the disposal and conveyance of a
part, or the whole of the property is necessary to a reduc-
tion, or cessation of the business, and the stockholders con-
sent, or do not object, we know of nothing in the statute, or
in sound public policy, to prevent the sale or conveyance for
such purpose. The State can have no interest in compelling
its citizens, or corporations, to carry on business of any kind
at a loss. No sound public policy can drive corporations, or
private individuals, unwillingly to insolvency. The interests
of business men, and of the public, must necessarily coin-
cide; for the prosperity of the State is but the aggregate of
the prosperity of its citizens. These views are supported by
the authorities, and we know of nothing to the contrary. In
*Treadwell* v. *Salisbury Manufacturing Co.*, 7 Gray, 393, where
a stockholder filed a bill to restrain the sale of all the prop-
erty of the company to a new corporation for stocks, to be
distributed to the stockholders of the old, it was held that
the Directors of a manufacturing corporation, as the best
means of continuing the business, and pursuant to the votes
of a majority of the stockholders, though against the protest
of a minority, may sell the whole property of the corpora-
tion to a new corporation, taking payment in shares of the
new corporation, to be distributed among those of the old
stockholders who are willing to take them. The Court say :
"We entertain no doubt of the right of a corporation estab-
lished solely for trading and manufacturing purposes, by a
vote of the majority of its stockholders, to wind up their
affairs and close their business, if in the exercise of a sound

discretion they deem it expedient to do so." After suggesting that there may be some limitation applicable to *quasi* public corporations, such as railway, canal, and turnpike companies, " to which the right of eminent domain and other large privileges are granted in order to enable them to accommodate the public," which do not apply to purely private, commercial and manufacturing corporations, the Court say, with reference to the latter: "Neither the public, nor the Legislature, have any direct interest in their business or its management. These are committed solely to the stockholders, who have a pecuniary stake in the proper conduct of their affairs. By accepting a charter they do not undertake to carry on business, for which they are incorporated, indefinitely and without any regard to the condition of their corporate property. Public policy does not require them to go on at a loss. On the contrary, it would seem very clearly to be for the public welfare, as well as for the interests of the stockholders, that they should cease to transact business as soon as, in the exercise of a sound judgment, it is found that it cannot be prudently continued. If this be not so, we do not see that any limit could be put to the business of a trading corporation short of the entire loss or destruction of its corporate property. The stockholders could be compelled to carry it on until it came to actual insolvency. Such a doctrine is without any support in reason or authority. * * * Upon the facts found in the case before us, we see no reason to doubt that the vote of the majority of the stockholders for the sale of the corporate property and the closing of the business of the corporation was justified by the condition of their affairs. Without available capital, and without the means of procuring it, the further prosecution of their business would be unprofitable, if not impracticable. Under these circumstances, it was in furtherance of the purposes of the corporation to pay their debts, close their affairs, and settle with their stockholders on terms most advantageous to them." (7 Gray, 404, 405.) So, also, it was held that the whole property of the corporation might be sold to a new

corporation, and the shares of the new corporation taken in payment, to be distributed among those of the old stockholders who were willing to take them. The Court say: "Nor can we see anything in the proposed sale to a new corporation and the receipt of the stock in payment which makes the transaction illegal. It is not a sale by a Trustee to himself for his own benefit, but it is a sale to another corporation for the benefit and with the consent of the *cestui que trust*, the old stockholders. The new stock is taken in lieu of money, to be distributed among those stockholders who are willing to receive it, or to be converted into money by those who do not desire to retain it. Being done fairly and not collusively as a mode of payment for the property of the corporation, that transaction is not open to valid objection by a minority of the stockholders. (*Hodges* v. *New England Screw Co.*, 1 R. I. 347, 405, 406.) So in *Sargent* v. *Webster*, 13 Met. 498, it was held that the Directors of an insolvent manufacturing corporation have authority to convey all the property of the corporation to one of its creditors, upon condition that he shall apply the property to the payment of his claim, and pay over the surplus, if any, to the treasurer of the corporation. Say the Court: "Nor does it appear that the proceeding was not in furtherance of the purposes of the corporation. It was a trading corporation, and one of their purposes was to pay their debts, to enable them either to go on successfully again, by the aid of new assessments, or to wind up and settle upon terms most advantageous to the stockholders." (*Ib.* 503, 504.)

These are but examples of cases in which it may be in furtherance of the purposes of a corporation like the one in question, to convey a part or all of its property, and in making such conveyance for such purpose, the corporation would be acting within the general scope of its powers.

In the case now under consideration, it may be that a point had been reached whence it was impracticable to advantageously proceed in the original undertaking, and that the

CAL. REPS. XXXVII—75

formation of a new corporation, and conveyance to it of the property of two competing corporations, thus uniting all interests under one management, would subserve the interests of all concerned, and of the public. It appears that after the two old competing corporations had conveyed to the new one, the latter paid off large incumbrances before created by the former, so that the Miners' Ditch Company must have been largely in debt. After the conveyance, when all competition had ceased—and, it may be supposed, that the business with the monopoly of the water would be most profitable—the new corporation was compelled to borrow large sums of money, mortgage its property, and finally deliver possession to the mortgagee, after which the interest of said corporation was sold out by the Sheriff. This shows that it is possible, if not probable, that the affairs of the "Miners' Ditch Company" had reached a condition in which the legitimate purposes of the corporation could only be subserved by a sale of its property for the payment of its debts. It shows at least that circumstances might exist which would require a sale for the lawful purposes of the corporation—circumstances under which the property of the corporation, if not sold upon better terms by the corporation itself, might be sold *in invitum* at a loss, and the interests of both stockholders and creditors sacrificed by a forced sale under the hammer of the Sheriff.

It is very clear to our minds that many circumstances might arise, in view of which the lawful purposes of the corporation might require a sale and conveyance of a part, or of all, the property of the Miners' Ditch Company. The power to sell, and the power to make a conveyance in pursuance of the sale, exists. Under many circumstances the question as to want of power, in the given case, cannot be determined by a mere comparison of the fact of a conveyance, and the terms of the deed executed, with the powers granted by the charter. If the conveyance of the corporate property in a given instance is *ultra vires*, in view of the purposes for which they are made, then the want of power

" depends not merely upon the law under which the corporation acts, but upon extrinsic facts, resting peculiarly within the knowledge of the corporate officers," and, as we have seen, the invalidity of the sale is not available to the corporation in contests arising between the corporation itself, and strangers dealing with it, without knowledge in fact of the alleged purpose. The corporation has power to make a sale and power to execute a deed for a lawful purpose, and where the duly appointed officers assume to make a sale or conveyance, strangers dealing with it have a right to suppose the purpose lawful. So, if the corporation could convey at all, it could convey to any person, natural or artificial, capable of taking. The Miners' Ditch Company might, for a lawful purpose, have conveyed to the Eureka Lake Company, and if the Eureka *Lake* Company, why not to the Eureka Lake *Water* Company? The latter was a legal corporation. There was nothing in the law to prevent the stockholders of either, or both of the old corporations, from incorporating themselves into one, or a dozen other companies; and each new corporation formed would be a distinct and complete legal entity, having a separate and independent existence, with all the functions and powers conferred upon it by the law under which it came into existence.

There is nothing in *Abbott* v. *American Hard Rubber Co.*, 33 Barb. 580, or *Conro* v. *Port Henry Iron Co.*, 12 Barb. 64, and cases of that class, or any others that have been brought to our notice, in conflict with anything contained in the views here expressed. The former was an action by *stockholders* against the *Directors* and corporation and others, who were *particeps criminis*, to set aside a transfer of all the property of the corporation made in fraud of the rights of the com_ plainants. (33 Barb. 594, 595.) In view of the facts of that case the Court very properly say: " The experiment of the acting Trustees in the two hard rubber companies has the merit of boldness as well as originality. Three of them marched out of the old company laden with spoils with which they enriched themselves as stockholders of the new,

and it cannot be that their wronged and injured associates are remediless." (*Ib.* 595.) The discussion of the law must be considered with reference to the facts of the case. The latter was a case in equity between the creditors, on one side, and the corporation and other parties to the wrongful acts complained of, with knowledge of their illegality. The transfer affirmatively appeared not to be the act of the corporation. There was a breach of trust, and acts fraudulent as to creditors, and the proceedings to set aside the transfers were had by creditors in pursuance of express statutory provisions applicable to such cases. (12 Barb. 62, 63, 64.) A very cursory examination is sufficient to show that there is nothing in the case in conflict with the views expressed in this opinion.

The next point is, that the deed of October 20th, 1860, from the Miners' Ditch Company to the Eureka Lake Water Company is void, because not authorized by the Board of Trustees acting as a Board. In *Gashwiler* v. *Willis*, 33 Cal. 16, we held a conveyance executed by the Trustees individually in pursuance of a resolution of the stockholders of a mining corporation, without any authority from the Board of Trustees acting as a Board, and not having the corporate seal attached, to be void for want of authority to execute it; and we find no reason to be dissatisfied with that decision. But in that case the party offering the deed made it affirmatively appear under what precise authority the act was performed, and there was no corporate seal affixed. The parties severally used their private seals, for the reason that there was no corporate seal, and in such cases, we held, that authority to execute the deed, and by implication, at least, to adopt a seal *pro hac vice* by the party assuming that power, must be shown. The seal affixed must of course be shown to be the corporate seal. These facts were not shown, and the deed was held to be inadmissible till further proof should be made. We expressly reserved the question as to what the rule would be where the regularly adopted corporate seal is shown by competent proof to be affixed to the deed. (*Ib.*

19.) This precise question is now presented. The instrument in question purports on its face to be an "indenture * * * between the Miners' Ditch Company, a corporation duly organized by law, * * * party of the first part," and the Eureka Lake Water Company of the second part. It concludes: "In witness whereof, the said party of the first part hath hereunto set its hand and seal, the day and year first above written, by its Trustees thereunto duly authorized." Signed by five parties, as Trustees, with the corporate seal affixed. It is admitted in the replication, and found by the Court, that the parties thus signing were at the time of the signing the Trustees, and that the seal affixed is the corporate seal, and that they signed the instrument and affixed the seal. Upon this state of facts appearing, the deed was admissible in evidence, and, being in, was *prima facie* evidence of the regular and duly authorized execution of the deed. This point is settled by the decisions. Angel & Ames state the rule deduced from the authorities thus: "Where the common seal of a corporation appears to be affixed to an instrument, and the signatures of the proper officers are proved, Courts are to presume that the officers did not exceed their authority, and the seal itself is *prima facie* evidence that it was affixed by the proper authority. The contrary must be shown by the objecting party." (Ang. & Ames on Corp., Sec. 224.) The Supreme Court of the United States say: "This mortgage had the corporate seal attached, and the presumption was that it was there rightfully, and the Court properly admitted it to be read in evidence." (*Kœhler* v. *Black River Falls Iron Co.*, 2 Black. 717.) Mr. Chief Justice Shaw says: "In the first place, the deed, duly executed by the corporate seal of the bank and produced by the party claiming under it, is *prima facie* a good title, and it is for those who wish to set it aside to impeach it." (*Burrill* v. *Bank of Nahant*, 2 Met. 166.) And Mr. Chancellor Walworth states the rule thus: "The seal of a corporation aggregate affixed to a deed is of itself *prima facie* evidence that it was so affixed by the authority of the

corporation, especially if it is proved to have been put to the deed by an officer who was intrusted by the corporation with the custody of such seal, (see 1 Kyd on Corp., and Angel & Ames on Corp., 115,) and it lies with the party objecting to the due execution of the deed. to show that the corporate seal was affixed to it surreptitiously or improperly; and that all the preliminary steps to authorize the officer having the legal custody of the seal to affix it to the deed, had not been complied with." (*Lovett* v. *Steam Sawmill Association*, 6 Paige, 60.) To the same effect are the following cases: *Leggett* v. *N. J. M. & B. Co.*, 1 Sax. Ch. 559; *Levering* v. *Mayor*, etc., 7 Humph. 558; *Hoyt* v. *Thompson*, 1 Seld. 335; same case, 3 Sand., S. C., 428, and 3 Bosw. 285: *Jackson* v. *Campbell*, 5 Wend. 575; *Flint* v. *Clinton Company and Trustee*, 12 N. H. 433; *Hill* v. *Manchester and Salford W. W. Co.*, 5 B. & Ad. 874; *Clarke* v. *Imperial Gaslight Co.*, 4 B. & Ad. 326; *Berks and Daup. Tp. Co.* v. *Myers*, 6 Sergt. & R. 13, 15.

The rule must be as stated on principle, independent of authority. Any other would be subversive of the public interests, for no man could deal in safety with corporations, and all business transactions with these institutions would almost necessarily cease, and the end of their creation fail of accomplishment. Confidence is a necessary element in all business transactions. If strangers cannot rely, at least, *prima facie* upon deeds of private corporations apparently regularly executed in pursuance of the powers conferred by their charters under the corporate seal, and attested by the signatures of the officers, upon whom the control of their affairs is devolved by law, upon what may they rely? This is the most direct, formal and solemn assurance that can possibly be given by those authorized to give assurances. It is the legally appointed mode in which the corporation speaks to the external world, and manifests its corporate will. Parties dealing with private corporations have no other reliable means of ascertaining the circumstances under which the act is done. The books, records and papers of such corporations are private property, and not open to inspection by

strangers. Many, if not in practice most, of their corporate acts are not made matters of record. Besides, it is as easy to make a false statement in some other mode—by a false record—as by a false deed. Whatever is done must be done through agents, and if their most formal and solemn assurances under the corporate seal are not reliable, then none of their acts can be depended on, and those dealing with corporations are absolutely without the means of self-protection. The rule established rests upon a foundation of solid sense. If this is not the rule, then, surely, there is too much truth in the saying that corporations are intangible, impersonal, irresponsible, soulless, artificial beings, endowed with a capacity to accumulate and enjoy property, and exercise most of the functions and privileges pertaining to natural, material persons, but under no moral restraints and subject to few of the implications and responsibilities to which natural persons are liable, and the less men have to do with them the better it will be for them.

If it be conceded, then, that the corporation, in a contest with a party purchasing in good faith for a valuable consideration, relying upon the presumption arising upon the face of a deed apparently regularly executed under the corporate seal, and by the officers upon whom the law confers the corporate powers, may rebut the presumption, (upon which point we now express no opinion,) it is clear from the authorities cited that the burden of overthrowing the presumption in this case rested upon the corporation—the party denying the validity of the deed.

Upon the facts admitted and found then, notwithstanding the denial of authority by plaintiff *prima facie*, the presumption arises, and it affirmatively appears in favor of defendant, Zellerbach, that the deed was executed by authority of the corporation. Aside from the presumption, although it is found, that it did not affirmatively appear from the other evidence whether the authority was conferred at a meeting of the stockholders only, or at a meeting of the Board of Directors, or of both, still, since the burden of overthrowing

the presumption is on the corporation, it is sufficient for defendant, Zellerbach, that the contrary did not affirmatively appear.

It is claimed, also, that the testimony does not justify the finding of the Court to the effect, that the exact character of the meeting in September, at which the Trustees were authorized to convey the property of the Miners' Ditch Company, as whether a meeting of stockholders or of the Trustees, as a meeting of both, is not clearly shown, and inferentially therefrom the finding against the plaintiff on the issue, or to the authority of the Trustees to execute the deed. We should not be justified in setting aside the finding on this point. The evidence is very loose, at best, and we should expect to find it so. It must be remembered that the business was loosely done, and no minutes appear to have been preserved. The meeting was held nearly seven years before the date of the finding. For five years after that time there had been no other meeting of Directors. The grantee under the deed had been in the continued possession, expending large sums of money on the property conveyed under a claim of ownership. And neither the corporation, the Trustees, nor the stockholders, from the date of the deed set up any claim, or suggested any doubt as to the validity of the conveyance. After so long silence on the part of those interested, under the circumstances of this case, there certainly should be required some very clear and conclusive testimony on the part of the plaintiff to justify the Court below in finding affirmatively facts to overthrow the presumption raised by the law upon the other facts clearly established and found, and as to which finding the exception was taken. We think the finding of the Court clearly justified. The burden of overthrowing the presumption raised by the deed rested on the plaintiff, and we do not think it overthrown.

To recapitulate and apply the principles of law stated: Prior to the 29th of October, 1860, the Miners' Ditch Company, a corporation duly organized, was the owner, and in possession, of the property in suit. On that day a deed

of conveyance was executed in the name and on behalf, and purporting to be by the authority of the corporation by its Trustees, and under the corporate seal affixed by said Trustees, by which said property is purported to have been conveyed to the Eureka Lake Water Company, another corporation duly organized and capable of receiving a conveyance of such property, and the possession was delivered to and received by said latter corporation. The last named corporation continued in possession of said property, claiming to be the owner under said conveyance, and from time to time made improvements on it to the amount of at least fifty thousand dollars, and paid off liens and mortgages created by the Miners' Ditch Company to the amount of at least ninety thousand dollars more. After the Eureka Lake Water Company had thus been in possession continuously improving and claiming it, as its own, for a period of some two years, in 1862 it mortgaged the property to the defendants, Zellerbach and Powers, two strangers, to secure the sum of two hundred thousand dollars, advanced and to be advanced, and all of which was, in fact, advanced to said company, on the faith of its title, before January, 1863. On the 3d of January, 1863, said company placed the property in the hands of the mortgagees, with authority to manage and apply the profits in satisfaction of the mortgage. Said defendants, under this agreement, continued so in possession till February 5th, 1865, at which time they acquired the title of the Eureka Lake Water Company through a sale by the Sheriff on a judgment in favor of one Martin against said company. Said mortgage had not been satisfied or paid by the rents and profits, or otherwise. No objection was made to said transfer to the Eureka Lake Water Company, or claim to said property set up by the Miners' Ditch Company, its Trustees or stockholders, from the date of the deed, in 1860, till the Fall of 1865, a short time before the commencement of this suit. The Miners' Ditch Company had power to sell the property, and to make such a deed as was made

CAL. REPS. XXXVII—76

for a proper purpose.  Upon the face of the charter and the deed the power existed.  A comparison of the deed with the charter disclosed no want of authority.  If any existed, it arose from extrinsic facts, which rested in the knowledge of the corporation and its agents, alone, and which strangers had no means of discovering.  Under the authorities cited, and upon principle, strangers dealing with the corporation, in ignorance of any extrinsic facts affecting the question of authority, were entitled to rely upon the apparent power. The deed itself was executed under the corporate seal, signed by the officers appointed by law to control the affairs of the corporation, duly acknowledged and recorded.  It carried upon its face, in the mode appointed by law, the most solemn assurance which the corporation, or its officers, were capable of giving, that the corporate assent had been given, and that everything had been done in pursuance of authority given by the Board of Trustees.  The presumption, *prima facie*, at least, that authority to execute the deed was given in such a manner as to render the deed a valid, corporate act, was thus raised, and this presumption was not overthrown by proof on the part of the corporation, upon which the burden of proof rested.  Title, therefore, was affirmatively shown in defendant, Zellerbach, and not overthrown by other evidence.

We need not inquire whether the conveyance could have been avoided by stockholders, or creditors, or the corporation itself, as between the Miners' Ditch Company and the Eureka Lake Water Company, on the ground that the latter was affected with notice of the illegal purpose, if any such there was, for which the Miners' Ditch Company made the conveyance, or whether there was in fact any illegal purpose, for the contest is not between those parties.  The contest is between the Miners' Ditch Company and Zellerbach, alone. Zellerbach, a stranger without notice—for none is found on his part—found the Eureka Lake Water Company in undisputed possession, expending vast amounts of money in improving and enlarging the works and paying off mortgages, claiming title under a deed regular on its face and

apparently executed in pursuance of authority granted by the charter. On the faith of these appearances he advanced two hundred thousand dollars, and subsequently took possession under an arrangement with the company, and finally purchased its interest under a Sheriff's sale, made at the instance of another creditor. He is, therefore, not affected by any knowledge of, or participation in, any wrongful acts of the Miners' Ditch Company on the part of the Eureka Lake Water Company. He is, certainly, in no worse position than he would be if he had been a purchaser directly from the Miners' Ditch Company, without knowledge of any illegal purpose in the sale, or defect of authority in the execution of the deed. Zellerbach is in no way affected by any of those latent vices, not brought to his notice, if any there be, which affected the transaction between the two corporations.

This suit is not brought by a stockholder, or a creditor. No person having an equitable interest has complained that the officers and Trustees have exceeded their authority, or violated the trust reposed in them to his injury. The corporation itself is plaintiff. After a five years, acquiescence, and long after the property has passed into the hands of innocent parties, who have advanced vast sums of money upon the faith of its apparent acts, paid off large liens, and greatly extended, improved, and increased the value of the property, this corporation seeks to avoid its deed. In the language of the Court below, the plaintiff says: " True, the deed is apparently mine. I made it in the only way in which I could have made it, through my Trustees and by my corporate seal; but in the internal and secret machinery of my existence the determination to make it was not regularly and properly arrived at. It is as though a natural person sought to avoid his deed by saying: 'True, my hand executed it, but my judgment dissented, and my will forbade it.' "

Upon the facts found, we do not see how the result could have been otherwise had the plaintiff been a stockholder, or a creditor. But however that may be, it is entirely clear to

our minds that the District Court was right in finding, and adjudging, that the title of Marks Zellerbach to the property in controversy "is a good and valid title in law and equity as against the Miners' Ditch Company," the plaintiff in this action, and that the judgment should be affirmed.

Numerous authorities were cited in the arguments of counsel, which we have not particularly noticed, for the reason that they do not appear to be opposed to the views we have expressed. Rights growing out of corporate relations are presented under a great variety of circumstances, and discussed in various aspects, but the distinctions are obvious enough to those who peruse the numerous decisions, and it would be unprofitable labor to comment upon, and distinguish each particular case. Suffice it to say, that we find nothing in the general current of authorities cited opposed to the principles upon which this case is determined. We have said nothing to impugn the general doctrine so well established that the Act of Incorporation is an enabling Act, and corporations can only exercise such powers as are expressly conferred upon them, together with such incidental powers as are necessary to a due exercise of those expressed, and that the powers must be exercised in the mode prescribed. Nor do we find it necessary to notice the distinction, if any there is, between common law and statutory corporations. It is presumed that no commercial, trading, manufacturing and such like corporations, created since the Revolution in this country, exist, which do not derive their existence under some statute, and probably, too, such is the case in most similar modern corporations in England. Most of the decisions upon the subject must, therefore, relate to statutory corporations.

Let the judgment be affirmed.

By the Court, SAWYER, C. J, on petition for rehearing:

Defendant, Zellerbach, is the only one interested in the property in dispute. In rendering the decision in this case, we proceeded upon the idea that he did not appear in the record to have any knowledge of the purpose of the Miner's Ditch Company in its conveyance to the Eureka Lake Water Company, to distribute the stock of the latter company received as the consideration of the conveyance, to the stockholders of the former, which is the fact in the case, if any there is, that renders the transaction between those corporations illegal. Our attention is now called to a fact not before brought to our notice by counsel, and overlooked when the opinion was written, that in the answer of Zellerbach stating the loan of money, through which the title was ultimately acquired by him, it is averred that the Eureka Lake Water Company "borrowed of this defendant and the defendant Powers (then partners in business under the firm of Marks & Co.) the sum," etc. It also appears in the findings that one George C. Powers signed, as Trustee, the conveyance of the Miners' Ditch Company to the Eureka Lake Water Company, and it is claimed that, as this is the same name as that of defendant Powers, it must be presumed that the Powers who signed the deed and who advanced the money as the partner of Zellerbach is the same person; that notice to one of the partners is notice to all, and that it therefore appears in the record that Zellerbach did have notice. Conceding this to be so, for the purposes of the decision, it becomes necessary to determine the point whether, upon that hypothesis, the Miner's Ditch Company stands in a position to avail itself of the illegality of its contract to distribute its capital stock to the stockholders of the corporation, by conveying its property and distributing the stock of another corporation received in payment, in the mode and under the circumstances stated in our former opinion, to its stockholders. And we are of the opinion that it does not. The act of sale and conveyance was not wholly beyond the power

of the corporation to perform.    It had full power to sell and convey its property.    It is provided that it shall not be lawful for the Trustees to divide or withdraw any portion of the capital stock.    The corporation having power to sell and convey its property, but it being made *unlawful* for the Trustees to divide the capital stock, the corporation stood upon the same footing in respect to such conveyance as any natural person with reference to a contract, which he has the power to make, but which is made unlawful upon some principle of public policy adopted by the law making power.    In this case the contract was wholly executed.    There was nothing of an executory character left on either side.    The conveyance was fully made by the Miner's Ditch Company to the Eureka Lake Water Company, and the grantee put completely in possession, and remained for years in such possession with the knowledge and acquiescence of both the corporation and its stockholders.    While so in possession, it executed its mortgage to Zellerbach and Powers, for the large sums of money advanced by them, and put them in possession, and this mortgage was subsequently foreclosed, and under the judgment of the Court the property was sold and purchased in by them, and the defendant, having now acquired the entire title, is in possession.    Large portions of the money advanced went in satisfaction of debts due from the Miner's Ditch Company.    At all events, the defendant was in possession under his conveyance, and the contracts were all fully executed on both sides, each having received and enjoyed the consideration.    There was nothing of an executory character left.    It is not sought by either party in this action to recover on any branch of an executory contract— the usual form in which questions in such cases are presented.    The question is which party, *in fact*, has the title as the case now stands, and, as between those parties, it is clearly in the defendant.    We know of no instance in which the grantor has been able to recover at law when the contract has been fully executed, as in this case.    *A fortiori*, he would not be entitled to relief in equity.    But in the worst view

that can be taken for the defendant the maxim applied in suits on illegal executory contracts, *in pari delicto potior est conditio possidentis, or defendentis*, would apply, and justify an affirmance of the judgment. But the defendant is in a better position than if sued, on an executory contract. (See *Schermerborn* v. *Salmon*, 14 N. Y. 141.) The contract is fully executed on both sides, and the transaction closed between them. The case of *Inhabitants of Worcester* v. *Eaton*, 11 Mass. 368, is precisely in point. The only difference is, in that case the grantor in the illegal deed is a natural person, and here it is a corporation. But with reference to the inherent power of the two persons to make a conveyance of the property conveyed, the parties stand on the same footing. The vice in both conveyances, if any there be, is that the contract is illegal for similar reasons. The principle is, therefore, the same. The consideration of the conveyance in the case cited was a composition of a felony. Yet the contract being fully executed, it was held to pass the title, and could not be avoided, so as to authorize a recovery by the grantor, or, which is the same thing, by the subsequent grantee of the grantor, and this, when an entry had been made for the very purpose of avoiding the deed. The case is in point, and we know of none to the contrary; besides, we believe it to be sound.

The plaintiff, however, claims the benefit of the maxim, because the defendant sets up the facts and prays affirmative relief. But we think the defendant, and not the plaintiff, is the party entitled to the benefit in this case. The defendant is in possession, and has been in possession for many years, with the acquiescence both of plaintiff and the stockholders, who have received and long enjoyed the consideration for the conveyance. The plaintiff brings the action to recover possession of the property conveyed. The defendants, to defeat a recovery, although it is unnecessary, set up the facts in their answer, as a defense, and the Court finds the facts in favor of the defendants, and holds upon the facts, as stated and found, that defendant has a title both in law and equity,

and so adjudges. And this is undoubtedly so. The facts constitute a *legal*, as well as an *equitable* defense, and there is no necessity whatever for any equitable or affirmative relief. It was only necessary, upon the facts alleged and found, to enter a judgment that plaintiff take nothing by his action. This is not the exact form of the judgment, but it is substantially that, and is no more extensive in its operation, as to the matters adjudged, than it would be in that form. Technically, it might just as well be in that form, and as a plea of *res adjudicata*, in another suit, it would cover the same issues. In effect, the relief is no more as it is than the ordinary judgment against plaintiff in an action for possession. In form, however, it adjudges the title to be in Zellerbach, and that, as between the parties, the plaintiff has no title. That is to say, the judgment simply adjudges what the present state of the title under the executed agreement, as between the parties, really is. It goes no further. It grants no active relief. It gives nothing on any executory promise. It does not change the position of the parties. It only determines what that position is, and leaves them in it. What before existed in fact and in law is simply adjudged to exist. It is now *res adjudicata*, and not open to further dispute. And this the Court would have determined as the basis of the judgment, although it would not have so expressed it in terms in the judgment, had the judgment been that the plaintiff take nothing by his action. But under the issues upon which such a judgment would have been entered, and the judgment in pursuance thereof, the same matters would have been *res adjudicata*, as under the present form of the judgment. In substance, then, the parties are left in the same condition in which the suit found them, as to their rights. We will look to the substance of the thing done, and not to the form, especially in a case like this, where it is clearly manifest that an outrageous injustice would be perpetrated upon the defendant, as between the parties to this action, if, under ordinary circumstances, they could be compelled to surrender this property to the plaintiff without

a return of the vast sums of money they have advanced to obtain it, and in a case, also, where it is quite apparent that none of the parties to the original transaction in fact mediated any wrong.    We have no idea that any of the parties at the time of the original conveyance supposed for a moment that they were performing any illegal act.

Rehearing denied.

Mr. Justice SANDERSON did not express an opinion on the question of granting a rehearing.